# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 08-22056-CIV-TORRES

FREDERIC ZINN and RANDI ZINN,
as Co-Personal Representatives of the
Estate of MICHAEL ZINN, deceased,

        Plaintiffs,

vs.

THE UNITED STATES OF AMERICA,

        Defendant.

_____/

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court following a multi-day bench trial conducted in this action. Plaintiffs Frederic and Randi Zinn filed this action on July 21, 2008, under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Plaintiffs alleged that the accident was caused by employees of the Federal Aviation Administration ("FAA") negligently providing air traffic control services to a general aviation aircraft, piloted by Michael Zinn ("Zinn"), who was killed when the aircraft crashed after confronting dangerous weather conditions. Plaintiffs allege that the FAA air traffic controllers failed to provide timely, complete and accurate weather information, issue warnings or alerts, and/or otherwise control the aircraft so as to avoid it encountering severe and dangerous weather.

The FAA and the United States deny liability and assert that the accident was caused by Zinn's failure to avoid known weather conditions despite having received multiple warnings about the presence of thunderstorms along his intended route of flight and despite his own ability to see and become aware of those conditions onboard his aircraft.  The FAA further asserts that, once he encountered convective activity within a thunderstorm, he failed to properly fly and control his aircraft, resulting in its loss and Zinn's death.  Relatedly, the FAA asserts that Zinn was operating in conditions that he was not authorized or prepared to navigate in derogation of FAA regulations, the failure of which proximately caused the loss of the aircraft and the pilot.  Alternatively, even if the FAA's controllers were negligent and such negligence proximately contributed to Zinn's death, the FAA raises the defense of comparative negligence based on Zinn's own negligence.

Apart from the liability issues in the case, the parties differ greatly on the proper methodology and calculation of the economic damages that the FAA may be liable for, principally in connection with the net accumulations damages to the estate under Florida law.  Zinn's estate claims that the gross damages exceeds $54 million based upon lost salary, bonuses, capital gains and dividends that Zinn would have realized through his working life had he not been lost, in addition to lost companionship damages to his surviving daughter.  The FAA takes the position, however, that the net accumulations to the estate would have been non-existent or negligible.

Before addressing these issues, we pause to note that neither the air traffic controllers nor Michael Zinn were bad actors in this tragic accident.  Throughout the

history of manned flight, weather has proven to be the greatest obstacle to safe human flight.  History shows us that a pilot's greatest enemy, more often than not, is nature's challenges.  The effects of thunderstorms, snow, icing, fog, and other inherent risks of nature repeatedly fill reports of air crash investigations all over the world.  That risk can be ameliorated, of course, and every pilot is trained to understand and prepare for that risk.  Air traffic controllers are trained to help them.  But no matter how much we try, we will never be able to eliminate those risks entirely unless we choose to abandon flight altogether.  We obviously choose not to do so because pilots like Michael Zinn will always be willing to take the unlikely chance of failure in exchange for the pursuit of the love of flight.[1]

---

[1]     *Courage is the price that life extracts for granting peace.*
*The soul that knows it not, knows no release from little things.*
*Knows not the livid loneliness of fear,*
*Nor mountain heights, where bitter joy can hear*
*The sound of wings.*

— Amelia Earhart

**Table of Contents**

I.   FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.   Michael Zinn's Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     B.   Zinn's Intended Flight Plan and Weather Conditions . . . . . . . . . . . . 6

     C.   Weather Information Available to Air Traffic Controllers . . . . . . . . 12

     D.   Zinn's Fatal Flight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     E.   Economic Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

          1.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

          2.   Zinn's Proposed Calculation . . . . . . . . . . . . . . . . . . . . . . . . 37

          3.   FAA's Reasonable Compensation Calculation . . . . . . . . . . . . 46

          4.   Court's Final Calculation of Net Accumulation to Estate . . . 53

          3.   Funeral Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

     F.   Non-Economic Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

II.  CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

     A.   The FAA's Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

          1.   Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

          2.   Breach of Those Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

          3.   Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

     B.   Zinn's Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

          1.   Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

          2.   Breach of Zinn's Duties . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

          3.   Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

     C.   Apportionment of Fault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

     D.   Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

## I.  FINDINGS OF FACT

### A.  *Michael Zinn's Background*

1.     Michael Zinn was born on December 20, 1952.  At an early age he successfully entered into the energy business.  He had worked for several years in the 1970's in the energy engineering company, HVCA, where he handled electrical design and procurement for commercial building projects.  During that time, he was also the director of a government-funded biomass-to-energy project where he designed and developed a commercial scale animal waste-to-energy plant.

2.     In 1976, at the age of 23, Mr. Zinn founded Bio-Energy Systems Incorporated, later known as Besicorp, as a distribution company for solar thermal products that he had created or was in the process of creating.  He would, years later, sell Besicorp for a substantial sum, making him a multi-millionaire in the process.

3.     Though he suffered various setbacks throughout his career, including a federal criminal investigation and conviction, he emerged as a successful entrepreneur and businessman.  He was also personally successful.  He married and raised a daughter, Randi Zinn born in 1979, who remained close and financially attached to her father until his death.

4.     Zinn, like all successful professionals, enjoyed the fruits of his labor, principally through the care and support of his only daughter.  But he also enjoyed golf and had a love of flying, interests that would fatefully and tragically intersect on the day he died, October 19, 2005.

5.      Zinn was an experienced private pilot.  Zinn obtained his initial piloting license in 1982.  He obtained his IFR certification in 1987.  On the date of the accident, after thirteen years of piloting experience, Zinn had logged over 1400 hours of flight time in various types of general aviation aircraft.

6.      Prior to his fatal last flight on October 19th, however, Zinn had not flown significantly for many months.  His last flight of any substantial duration (6.0 hours) took place on May 5, 2005. [PX 4 at 9] His latest flight was a short half-hour takeoff and landing on June 18, 2005.

7.      Zinn purchased his own aircraft charter company, River Aviation, which owned and operated six different aircraft by 2005, including the aircraft Zinn flew primarily, a 1978 twin-engine P337H Cessna Skymaster, registration number N5HU. The Skymaster had a unique "push me - pull you" design, with the two turbocharged propellor engines working simultaneously to propel the aircraft using centerline thrust. The aircraft was also pressurized, allowing for use in higher elevations.

8.      For some time before October 19, 2005, Zinn had been residing primarily in Boca Raton, Florida.  He regularly traveled to Kingston, New York, where his business operations were based.  On that day, he was flying N5HU to Myrtle Beach, South Carolina, to play a round of golf.

**B.    _Zinn's Intended Flight Plan and Weather Conditions_**

9.      Five days before his death, Zinn prepared his aircraft for use by having the engine inspected and the oil and filter changed.  It had been about four months since he had last flown it. [PX 1]

10.     On October 19th, Zinn intended to depart from Boca Raton in the early afternoon with a direct route to Myrtle Beach.  He prepared and filed an IFR flight plan, likely through a computer-based system.[2]

11.     To prepare for a flight, it is undisputed that a pilot must assess what the weather conditions will be and determine whether the weather is significant, whether there is turbulence, whether there is convective activity, or anything that will have an affect on the flight.

12.     Zinn, as an experienced pilot, more likely than not conducted that review as he had done in the past when, on more than one occasion, he had altered or cancelled his flight plans due to expected weather conditions.

13.     As a resident of South Florida, Zinn would also more likely than not have been aware of the propensity for thunderstorms to develop in the afternoon.

14.     It is undisputed that he ultimately departed Boca Raton at approximately 1830 UTC.[3]  Prior to departing Boca Raton, Zinn more likely than not performed a

---

[2]     Aircraft operations are generally divided into two categories: (1) flights conducted under Visual Flight Rules and (2) flights conducted under Instrument Flight Rules.  Visual Flight Rules ("VFR") are "[r]ules that govern the procedures for conducting flight under visual conditions.  The term 'VFR' is also used in the United States to indicate weather conditions that are equal to or greater than minimum of VFR requirements. In addition, it is used by pilots and controllers to indicate type of flight plan." [DX 1, AIM Pilot/Controller Glossary, Visual Flight Rules; see also 14 C.F.R. §§ 91.151-91.159.]  Instrument Flight Rules ("IFR") are "[r]ules governing the procedures for conducting instrument flight. Also, a term used by pilots and controllers to indicate type of flight plan." [*Id.*, AIM Pilot/Controller Glossary, Instrument Flight Rules; 14 C.F.R. §§ 91.167-91.193]  IFR conditions are "[w]eather conditions below the minimum for flight under visual flight rules." [*Id.*, AIM Pilot/Controller Glossary, IFR Conditions.]

[3]     "UTC" refers to Coordinated Universal Time, which on October 19th was four hours after Eastern Daylight Time.  Zinn thus departed at approximately 14:30

preflight inspection and check of his aircraft.  After completing the preflight check, Zinn performed an engine run-up and check after calling the Boca ground controller. The run-up and checks generally take 10-15 minutes.  The time between when he called the Boca tower from his location at Boca Aviation and the time he was cleared for take-off was about five minutes.

15.    When Zinn called the Boca Tower for taxi instructions at 1824:02, he advised the controller that he had information "Golf," indicating that he had tuned to and listened to the Automated Terminal Information Service ("ATIS"), which are recorded weather broadcasts available on a given radio frequency for a particular terminal area that provide weather and visibility conditions in the vicinity of a particular airport. [DX 83]

16.    SIGMETS are broadcast on the ATIS at Boca Raton Airport.[4]  At 1655 (about one and one-half hours before takeoff), Convective SIGMET 3E went into effect and was valid until 1855.  Convective SIGMET 3E advised of a developing line of thunderstorms 20 nautical miles wide with little movement and tops to level 33,000 feet.  This line extended 40 nautical miles west-southwest of Vero Beach to 90 nautical

---

p.m. EDT, or 2:30 in the afternoon.  All subsequent time references shall be in UTC time.

[4]    Pursuant to 14 C.F.R. § 91.103, Zinn was required to obtain all available information concerning the flight, including weather reports, weather forecasts and SIGMETs.  A Convective SIGMET is a "weather advisory concerning convective weather significant to the safety of all aircraft. Convective SIGMETs are issued for tornadoes, lines of thunderstorms, embedded thunderstorms of any intensity level, areas of thunderstorms greater than or equal to VIP level 4 with an area coverage of 4/10 (40%) or more, and hail 3/4 inch or greater." [DX 1, AIM Pilot/Controller Glossary, Convective SIGMET]

miles east-northeast of West Palm Beach.  [DX 4A]  The area affected by this SIGMET encompassed Zinn's intended route of flight.  As Zinn's piloting expert conceded, the conditions reported in Convective SIGMET 3E indicated a "pretty significant piece of weather."

17.    It is not disputed that Zinn considered (or should have considered) SIGMET 3E.  He acknowledged as much at the time he obtained the clearance to taxi and takeoff from Boca Raton.  Whether he received a subsequent SIGMET, however, is disputed.  At 1755 (about one-half hour prior to takeoff), Convective SIGMET 5E was issued for an area of Florida and coastal waters running from 60 miles east-northeast of Vero Beach, to 90 miles east-northeast of West Palm Beach, to 30 miles west of West Balm Beach, to 30 miles west-southwest of Vero Beach. [DX 5A] This SIGMET updated 3E by indicating the developing line of thunderstorms had turned into an area of thunderstorms and the tops had increased to 40,000 feet. Convective SIGMET 5E also encompassed the accident aircraft's route of flight.  This advisory was valid until 2155.

18.    We do not know precisely the type of weather briefing Zinn availed himself on the day of the accident.  It is likely that Zinn obtained material weather information from a computer or other unrecorded sources, which would have included actual radar images and forecasts for the particular line of weather that was developing in his intended route of flight.  We know that he did not contact flight services before his flight as a record of that communication would have been made.

19.    But, at the very least, Zinn clearly knew from the information contained in SIGMET 3E that he would be encountering thunderstorms on a route from Boca Raton direct to Ormond Beach (which he requested after takeoff).  This SIGMET also

put him on notice that updated information would be necessary to stay current regarding the weather situation. An experienced and competent pilot knew that he needed to be aware of the location of that weather and that he needed to consider it during his flight.

20.    Zinn's piloting expert testified that, if he read SIGMET 3E and pulled up NEXRAD and surface analysis charts which indicated a line of thunderstorms across his route of flight, he would hold off on the flight or plan a route to do whatever was necessary to go around that line of storms. It is beyond dispute that Zinn could have avoided all of the convective weather on his route by flying a more westerly route, northwest from Boca Raton around the center or western side of Lake Okeechobee.

21.    The presence of SIGMETS alone, however, does not require general aviation aircraft to avoid all flight. SIGMETS cover widespread areas and aircraft regularly operate in these areas. In fact, on the date of Zinn's flight, several aircraft operating in IFR and VFR conditions were traveling in areas covered by the convective SIGMETS.

22.    But convective SIGMETS like SIGMET 3E alert a pilot to the presence and threat of thunderstorms in the area that should be avoided entirely. Pilots are warned to stay clear of known thunderstorm activity by twenty miles because hazardous wind and turbulence may extend to as much as that distance from the edge of an intense convective cell. IFR certification, which allows a pilot to fly under non-visual meteorological conditions through the use of instruments, does nothing to minimize the risk to a pilot from the violent effects of a thunderstorm. Pilots are trained and warned that a severe thunderstorm can destroy an aircraft, especially from

shear that occurs between updrafts and downdrafts within the storm. Once one encounters that weather, it is very difficult to hold a constant altitude. Maneuvers a pilot uses in attempting to do so produces greatly increased stress and G-forces on the aircraft. Because there is no safe and assured way to pick soft spots in a thunderstorm, pilots are warned to avoid oncoming storms.

23.     As Zinn's flight departed, the weather in the area covered by SIGMET 3E was strengthening as predicted. The larger areas of thunderstorms and the overall pattern was basically stationary, but the thunder cell over Martin County where the accident occurred was expanding in size and intensity as Zinn departed. At 1815:50 a band of showers and thunderstorms stretched from east to west from Central Florida to the Atlantic Ocean, crossing the coastline over Southern Indian River County. The area of showers and thunderstorms over Martin County then expanded into southern St. Lucie County and intensified, while new showers and thunderstorms developed over north central Palm Beach County.

24.     By the time Zinn's aircraft reached that area in St. Lucie County, weather radar shows that it approached and entered into an area with reflectivities ranging from 50 to 55 dBZ echoes (VIP Level 5 and borderline Level 6).[5] VIP Level 5 corresponds with "intense" weather with severe turbulence, lightning, hail and

---

[5]     Reflectivity on a weather radar like this one is the measure of the efficiency of a target in intercepting and returning radio energy. It is a function of the drop size, distribution, number of particles per unity volume, physical state (ice or water), shape, and aspect. Reflectivity is normally displayed in decibels (dBZ), and is a general measure of echo intensity. The greater the echo, the greater the intensity of the weather. For standardization purposes, Video Integrator Processor levels (VIP) have been developed to objectively determine storm intensity levels.

organized surface wind gusts.  VIP Level 6 corresponds to "extreme" weather with severe turbulence, lightning, large hail, and extensive surface wind gusts.

25.     This convective weather is precisely the type of condition that pilots should avoid, in the words of Zinn's own piloting expert, "at all costs."  It is also the convective weather that SIGMET 3E forecast, which was necessitated by weather believed to be VIP Level 4 or greater with an area of coverage of 40% or more in the intended route of flight.

## C.     *Weather Information Available to Air Traffic Controllers*

26.     Air traffic controllers are provided with various sources of weather information to carry out their duties, including weather radar data, weather information displayed on a controller's radar scope, PIREPS (pilot reports of weather in the area), and SIGMETS.  They are required by the Air Traffic Control Manual, FAA Order 7110.65P, to become familiar with pertinent weather information when they come on duty and during their shift.

27.     Miami Center En Route Control Service ("Miami Center") provides services primarily to aircraft that are en route from one airport to another.  Miami Center has weather information available on a large plasma screen in each of the sectors where controllers sit that can display the reflectivity data using a standard 16-color scale frequently used by National Weather Service meteorologists.

28.     This plasma screen is accessible to air traffic controllers at Miami Center, but is not the primary weather information that they rely upon largely due to their location and need to attend to the radar screens at all material times.  The weather

radar available on the plasma screen primarily allows controllers to familiarize themselves with what is occurring in the area when they first come into the sector to perform their duties.

29.     Miami Center also has a certified meteorologist, employed by the National Weather Service, to provide current and forecasted weather information. The meteorologist on duty prepares graphic displays for use by controllers and supervisors that includes location of fronts, forecast, winds aloft, areas of turbulence, areas of severe thunderstorms or tornado watches, pilot reports and other convective weather such as Center Weather Advisories.

30.     The meteorologist also inputs information regarding the tops and winds aloft into meteorological briefing terminals, which is a computer monitor, that are located in each of the areas in Miami Center.  Tops are the highest level at which the NEXRAD radar would be detecting precipitation and provides information about the storm and winds aloft is a forecast produced by the National Weather Service that indicates the winds at various altitudes.

31.     Through their familiarization requirement and his briefing prior to assuming his responsibilities, the Miami controllers handling flights should be aware of the tops of the thunderstorms, relevant information at determining the possible severity of the convective activity in the storms.  Of course, similar information is available to a pilot through SIGMETS and other weather data available to a pilot before departing.

32.     The primary source of weather information regularly used by air traffic controllers at Miami Center is found on their own radar displays.  This is accomplished

through the Weather and Radar Processor (WARP) system. WARP is an FAA computer network that puts data from various weather radar stations around an Air Route Traffic Control Center, such as Miami Center, into the WARP system and then compiles the data into a mosaic image of reflectivity that can be shown on a controller's display using four colors of intensity.

33.    The speed by which WARP radar data depends on various factors. The more radar sites from which to obtain NEXRAD data, the quicker it reaches the controller's WARP display.

34.    In this case radar data input into the WARP system at Miami Center is generated from the Melbourne, Miami, and Tampa radars. The average delay at Miami Center is typically between 3 to 6 minutes, though that can vary at times depending on the radars that feed them and the level of precipitation that is encountered by each radar sweep. The modern WARP system is designed, however, to provide controllers with as much real-time weather data as possible. Controllers are trained that they can reasonably rely on that data in carrying out their weather advisory responsibilities.

35.    On their displays, Miami Center controllers can see the aircraft in the foreground and the weather radar imaging in the background. The weather on the controller's display is depicted using four colors of intensity. Light precipitation, which is less than 30 dBZ and corresponds to VIP Level 1, is displayed as black. Moderate precipitation, which is 30 - 40 dBZ and corresponds to VIP Level 2, is displayed as royal blue. Heavy, which is 40 - 50 dBZ and corresponds to VIP levels 3 and 4, is displayed as checkered cyan. Extreme, which is reflexivity values over 50 dBZ and corresponds to VIP Levels 5 and 6, is displayed as cyan.

36.    Although ATC radar systems display only precipitation, the presence of substantial precipitation correlates with the existence of thunderstorm hazards such as severe turbulence and hail.

37.    Zinn's aircraft was not equipped with any real-time radar instruments. The only weather information available was a "stormscope." The WX-1000+ Stormscope aboard this aircraft is a device that can detect electrical discharges or lightning strikes and plot them on a display in the cockpit.

38.    A stormscope, however, cannot and does not display areas of weather precipitation along the aircraft's route of flight like the 4-color weather information on a controller's display, which shows the precipitation intensity of weather.

39.    Unlike the controller's display which shows weather in relation to the future track of the aircraft, a stormscope is most effective in the immediate vicinity of the aircraft, but that can extend up to 25 nautical miles. [DX 101] The stormscope has an outer range of 200 nautical miles to allow a pilot to prepare for weather that will be encountered on a given flight plan.

**D.    _Zinn's Fatal Flight_**

40.    After completing his preflight checks and weather briefing, Zinn took off from Boca Raton at approximately 1833:25.  He immediately contacted the West Palm Beach Terminal Radar Approach Control facility and asked for "flight following."  Flight following is an additional service provided by ATC to VFR aircraft so long as time and traffic conditions permit.

41.     The first controller at PBI that Zinn spoke to was Brian Rivers. Rivers was qualified to work the South Arrival (FAR) position.  Rivers responded to the flight following request by first asking if Zinn wanted to activate his IFR flight plan. [DX 84a]

42.     Rivers was aware that Mr. Zinn had filed an instrument flight plan because a flight progress strip was generated at PBI when the flight plan was filed. [DX 130]  The route of flight indicated on that flight progress strip was a preferential departure route through a departure transition area.  Preferential departure routes are designed to standardize traffic flow out of high volume airports.  Preferential departure routes establish traffic flow so all of the aircraft are going out in the same direction. Pilots are trained to be familiar with these departure procedures and it is probable that Zinn was quite familiar with this departure procedure out of Boca Raton.

43.     The preferential departure route on the flight progress strip was the Lamore departure.  The Lamore departure route is a typical instrument clearance - approximately 75% of the departures from Boca Raton and PBI go out on the Lamore departure.  This departure would have routed Mr. Zinn out to the west and then to the north.  This route of flight would have taken Zinn him west of the area covered by the convective SIGMETs.

44.     Unfortunately, when asked if he wanted to activate his instrument flight plan, Zinn responded "oh umm as long as I can go straight to Ormond Beach I don't mind the IFR, I'll stay with you VFR and see what happens when I get north, is that okay?"  Rivers advised that he could probably go that route as long as he did not go above 10,000 feet. Zinn indicated that was acceptable and at approximately 1837:04 his

IFR clearance was issued with a direct routing rather than the routing indicated by the preferential departure route.

45.     Once the clearance was accepted and activated, Zinn was on an instrument flight plan for the duration of the accident flight.  Zinn could have declined to accept the clearance and could have cancelled his instrument flight plan at any time.  But the decision was Zinn's to remain VFR or take the IFR clearance.  It is understood that a pilot on a VFR clearance cannot try and circum-navigate or fly through weather, but must instead stay clear of any clouds or weather to maintain visual flight.  An instrument-rated pilot like Zinn, however, can fly through cloud cover and under IFR conditions.

46.     Zinn's IFR route of flight was changed from the preferential departure procedure to a direct route at his request. Indeed, an air traffic controller cannot deny an instrument clearance to a pilot based on weather conditions.

47.     The issuance of the clearance to Mr. Zinn to go direct to Ormond Beach made no representation concerning the weather.  But the controllers at PBI cannot readily see weather for more than a 40-50 mile range.  And the controllers cannot and do not check routes for weather prior to issuing a clearance.  Indeed, the FAA regulations for IFR clearances, FAA Order 7110.65P section 4-2-3, does not require or even reference the delivery of information per se in connection with an IFR clearance.

48.     But even if the clearance controller breached his duty of care in providing adequate weather information, Zinn already knew from the SIGMETS issued prior to his departure that the direct route he requested would have encountered developing weather.  Zinn would also have been able to see developing cumulonimbus clouds ahead

of him as he progressed north from Boca Raton.  This controller's negligence and failure to proper FAA procedures, if any, did not cause in fact, or otherwise proximately cause, any injury to Zinn.

49.     At approximately 1839:43 UTC, Zinn was advised "five hotel uniform contact Palm Beach approach on one two eight point three, goodbye."  Zinn responded "one two eight point three five, hotel uniform, thank you."  [DX 84a]

50.     At approximately 1840:01 UTC, Zinn contacted the Palm Beach North Departure (BDR) position which was staffed by qualified controller David Miller.  He then quickly advised Miller that he wanted to deviate east of his route to avoid a "build-up."  When a pilot reports a build-up, controllers understand that they are seeing weather out of their aircraft window.  Miller advised the deviation was approved and instructed Zinn to proceed direct to Vero Beach when able stating "it looks like direct Vero is the best shot for you, there's some weather west of Stuart, uh that track should keep you out of it."   Zinn advised that if he went higher he would go direct, but that right then he had to go east.

51.     At 1840:36 UTC, Miller instructed Zinn to climb and maintain 9,000 feet.  Zinn responded "five hotel uniform climbing to nine, thank you."  At 1849:45, Miller instructed Zinn to contact Miami ARTCC.  Zinn acknowledged.

52.     Miller's communications to Zinn included a disclosure of developing weather west of Stuart, which fact was already known to Zinn through the SIGMETs he reviewed and Zinn's own observations onboard the aircraft.  Miller did not, however, relay to the Miami ARTCC controller, as set forth in FAA Order 7110.65P, section 5-4-5, the weather deviation he had approved.  But even if Miller failed to comply with that

regulation, that did not by itself constitute a breach of his duties owed to Zinn.  And even if it had, Miller's breach of this duty was not a cause in fact, nor a proximate cause, of any injury to Zinn.  Zinn's subsequent communications with the ARTCC controllers evidenced mutual understanding of convective weather activity that Zinn was approaching for which further deviations would be required.  Thus, Miller's neglect in his communications with the ARTCC controller did not contribute to Zinn's loss.

53.     After Zinn was handed off to Miami ARTCC by Miller, at 1849:51, Zinn contacted Kenneth Beers at the "R3" position at MIA ARTCC and advised that he was level at 9,000 feet.  (The R3 sector at Miami Center is also called Melbourne Low).  The R3 sector encompasses airspace from the surface to 4000 feet and the R4 sector encompasses 5000 to 9000 feet.  On the day of the accident the sectors were combined.

54.     At 1850:09 Zinn asked Beers if he could get a higher altitude.  Beers responded "I'll have higher for you in about two minutes if that works for you."  Because R3 is only responsible for airspace to 9000 feet, Beers needed to "flash" the aircraft to the controller working the airspace above 9000 feet (sector R22).  Flashing the aircraft means directing a hand-off.  When the other controller accepts the handoff, Beers could issue a frequency change to the pilot to contact the next controller.

55.     Beers asked the pilot if two minutes would be okay for the higher altitude because he estimated the handoff process would take approximately that long.  Zinn responded "good, I just might have to deviate left or right, I'm not sure yet."  Seconds later, at 1850:26, Zinn advised of his decision to deviate, stating "I'm going to make it to the east."  Beers responded "roger okay, uh Vero Beach when able."

56.     Zinn's statement that he wanted to deviate to the east indicated that Zinn could see and appreciate the weather ahead and was taking action.  Because Zinn was deviating on his own, Beers believed that a weather advisory was unnecessary.

57.     During the time that the aircraft was on the R3 frequency, Beers was giving a position relief briefing to Timothy Quinn who was about to take control of the sector.  A controller position relief briefing is an operational requirement that is safety related and not and administrative function.  As part of that relief briefing, Beers advised that Zinn needed to be "shipped" or transferred to the next control sector because Zinn wanted to go higher than 9000 feet.

58.     Quinn assumed control of the position and issued a frequency change to Zinn that transferred the aircraft to R22.  Quinn did not issue weather advisories to Zinn because he did not consider the weather to be a factor to the aircraft's route of flight.  Quinn's decision not to provide Zinn with weather information was also reasonable because the pilot had requested a higher altitude which would place the aircraft in the R22 sector's airspace and it was more important for the R3 controller to effectuate that transfer of the aircraft to the R22 sector.

59.     Thus, an updated weather briefing from Quinn was neither pertinent nor possible as the primary and most essential function of that controller was to properly transfer the aircraft to the R22 sector.  Quinn did not breach a duty owed to Zinn in this regard.

60.     Following that transfer, the next position along the aircraft's route of flight was the R22 position at Miami ARTCC being worked by controller Harvey Pake.  At 1852:00, Zinn contacted the R22 position and said "miami center skymaster five hotel

uniform uh request climb." At 1852:05, Pake responded "November five hotel uniform miami center, climb and maintain one one thousand." At the time Zinn signed on the frequency, the aircraft was northwest of the Stuart Airport. No other aircraft had been in that area.

61.    At 1852:11, Pake issued pertinent weather information to Zinn, advising him "November five hotel uniform be advised weather area twelve o'clock five miles moderate to heavy precipitation. I do show a break about five miles wide and then picks back up to heavy, extreme and uh, correction, moderate to heavy and extreme precipitation. Advise of your deviations please."

62.    Pake's issuance of weather information at this point in his communication with Zinn was in general compliance with the provisions of FAA Order 7110.65P, section 2-6-4. It also satisfied Pake's duty of care to Zinn to provide relevant weather information if possible given Pake's primary obligation at traffic separation. But at the moment of this transmission, Zinn was approaching heavy precipitation ranging from 10 o'clock to 1 o'clock, based upon radar returns available to Pake. It would have been most accurate to provide that weather advisory at the time of this transmission.

63.    At 1852:25, Zinn responded "five hotel uniform, deviating to the west around that weather, looks clear behind that." At 1852:31 Pake responded "alright, uh understand you want to go west." Zinn replied "yes sir, I'm heading 300 right now to get by that weather."

64.    This transmission indicated to Pake that the pilot saw a clearing, signifying that he was still under VMC conditions. It also manifested a clear intent

from Zinn to deviate in that direction to avoid the "moderate to heavy precipitation" that Zinn was alerted to.

65.     Pake deferred to Zinn's choice of route, which deference was reasonable under the circumstances and not a breach of the duty of care owed to Zinn.

66.     But given that at that precise moment in time moderate, heavy and possibly even extreme echos were visible on Pake's radar screen, a turn to a 300 degree heading, northwest of Zinn's existing position, would bring Zinn's aircraft perilously close to the leading edge of a convective cell, an area that can present very hazardous conditions.

67.     A 300 degree heading at that point undoubtedly made the weather to Zinn's 10 o'clock highly pertinent to the route of flight he chose.  Pake, who paused and seemed to recognize the possible danger this could pose given what he could see on his radar screen, never updated or supplemented the weather briefing he had provided earlier.

68.     Radar returns at that point confirm that there was indeed a small break between patches of convective activity that Zinn was encountering.  This small break is possibly the "clearing" that Zinn believed was available to him on his route of flight. The problem is that the small break was fairly small and clearly did not take Zinn safely clear of the center of convective activity as required by a pilot's duty of care, which the FAA itself warns pilots against.

69.     A reasonably prudent controller, when presented with this information and observing what was readily visible to him on his radar screen, should have corrected the

earlier incomplete briefing and provide Zinn with a clear indication that heavy precipitation and echo intensities were still possible on a 300 degree deviation.

70.     It is true that when Zinn indicated he wanted to deviate west, a possible separation issue arose because of Zinn's proximity to the boundary of Sector 46. Accordingly, Pake performed a "point out" to the sector 46 controller.  That separation issue did not relieve Pake, however, from the duty to provide accurate weather information when possible, as required by FAA Order 7110.65P, section 2-6-4.  It was indeed possible for Pake to make that clarification, especially given the hazardous weather Zinn was encountering, as known to Pake based on the radar returns available to him at that precise moment.

71.     It is also true that during this time period Zinn should have been aware of lightning strikes to his northwest on the stormscope, again on the reasonable inference that it was engaged at the time.  The lightning strikes remain depicted on the stormscope display for two to four minutes.  Because there was constant lightning along the accident flight's route, Zinn's stormscope would have continuously depicted lightning.

72.     Nevertheless, Zinn proceeded on his 300 degree deviation.  Thirty seconds later, at 1853:05 Zinn asked "Hotel uniform, uh does my heading look clear to you at this point."  Zinn's voice on the audiotape recording of the communication expresses some agitation.  The radar returns for that specific moment in time, which were available to Pake, evidenced that Zinn was edging perilously close to the northeast edge of a heavy to possibly extreme center of convective activity, well within the twenty-mile area that should be avoided by small aircraft pilots.

73. At that moment, it is more likely than not that Zinn was encountering severe turbulence, windshear and extreme G-forces on the aircraft that was making it difficult to control the aircraft.

74. Nevertheless, at 1853:05, Pake responded "November five hotel uniform, I cannot uh suggest any heading because my weather radar only picks up precipitation and is not as accurate as what you see out the window. You are cleared to deviate left and right of course. When able, direct to Melbourne. Just advise when you can go back." At 1853:18 Zinn responded "five hotel uniform, wilco," indicating that he understood the transmission and would comply.

75. It is true that ATC controllers do not know what is "clear" because they only see precipitation on their radar scopes. They do not see clouds and cannot tell if a path is clear. Pake could have interpreted the question from Zinn as asking whether there were any visibly clear areas along Zinn's route of flight, which a reasonable controller is not able to provide.

76. But, a reasonably prudent controller would also have understood that Zinn was at minimum asking for the controller to "[p]rovide radar navigational guidance and/or approve deviations around weather or chaff areas when requested by the pilot." FAA Order 7110.65P, section 2-6-4(a).

77. That same regulation provides that the controller "suggest an alternative course of action" when a deviation cannot be approved as requested and the situation permits. *Id.* section 2-6-4(a)(4). Given the data available to the controller and the time that he had to address Zinn's request, a reasonably prudent controller would have

indeed provided an alternative course of action to Zinn at that moment given that Zinn was undoubtedly encountering possibly severe conditions.  An immediate 20 to 30 degree turn would have been the advisable course and response to Zinn's request for assistance, as the controller is required to do "[i]n areas of significant weather . . . to suggest, upon pilot request, the use of alternative routes/altitudes." *Id.* section 2-6-4(b).

78.    At the very least, even if a course recommendation was not feasible given the complexity of the entire weather area that Zinn was encountering, and the uncertainty that the controller may have had as to the precise location that Zinn was in that corresponded with the radar returns available to Pake, a reasonably prudent controller at minimum would have had to clarify the earlier weather briefing that Pake provided.  Specifically, given the 300 degree heading that Pake had just approved, and in response to a request for assistance from the pilot, an immediate indication to the pilot that a ten o'clock heading was also encountering heavy to extreme precipitation was essential.  That information, which was accurate and reasonably reliable based upon the data that the controller could see on his screen, was the bare minimum that the controller should have provided to satisfy his duty of care.  That information, however, was not provided at the time that it was most needed by the pilot.

79.    Moreover, the proper way to issue weather was also the subject of additional training that took place at Miami Center on July 12, 2005, just prior to this accident.  Clinton Weekes, Miami Center Operations Manager, distributed a memorandum to facility managers at Miami Center regarding DSR radar intensities and WARP radar intensities.  He explained that two accidents had occurred on June 20,

2005 while both aircraft were in hazardous weather under the control of Miami Center and that "the investigation of controllers and supervisors revealed deficiencies in both parties related to collection, interpretation and dissemination of weather data." [PX 88] Mr. Weekes attached section 2-6-4 of FAA Order 7110.65P to his memorandum so that the facility managers could properly instruct their controllers on their duty responsibilities when working aircraft in weather.

80.     Instead, and compounding the breach of the duty of care, Pake provided Zinn with incorrect information; namely, that he had no ability to suggest a heading at all.  We know from the governing regulation and FAA manual that this is not the case. *Id.*  In addition, air traffic controllers are directed to vector aircraft for safety reasons as set forth in section 5-6-1, which provides for vectoring of aircraft "[i]n controlled airspace for separation, safety, noise abatement, operational advantage, or when a pilot requests."  Clearly, aircraft encountering an area of convective activity presents a hazardous safety situation.  Hence, two bases for vectoring an aircraft existed at the time and required a reasonably prudent controller to assist the pilot with a vector heading that was most reasonable given the information available to the controller.

81.     Notwithstanding the plain language of the FAA Order, and the training disseminated to controllers at Miami Center regarding their duties to provide weather assistance under section 2-6-4, Pake neglected to provide assistance when it was possible to do so, and at minimum failed to provide a complete and accurate weather briefing to better allow the pilot to address the situation and deviate accordingly.

82.    We find that it is more likely than not that the pilot, when correctly informed of the hazard still present at a 300 degree heading, would have reconsidered his decision and altered his course.

83.    It is certainly possible that when provided this missing assistance and briefing, Zinn would have pursued the deviation he requested.  We cannot know for certain, but we do know that had the controller provided that information he would have satisfied his duty of care.  That did not occur here.

84.    Two minutes went by at this point with Zinn deviating to a 300 degree heading notwithstanding the heavy precipitation and convective weather he was encountering.  It is more likely than not that Zinn's aircraft was in the thick of turbulence and wind shear associated with the leading edge of a convective cell that encompassed extreme conditions.

85.    At approximately 1855:20, controller April O'Connor plugged in to the R22 position to relieve Pake from the position for a break.  Pake was then engaged in coordination communications with the Sector 46 controller.  Shortly after plugging in to the position, O'Connor observed the altitude display on the data block for Zinn's aircraft jump above the assigned altitude of 11000 feet.  In response, O'Connor pointed at the aircraft and advised Pake that she thought Zinn needed something.  Pake terminated his conversation with the Sector 20 controller and called out to Zinn.

86.    At 1855:25 Zinn asked for a block altitude and then asks the controller "do you have any weather ahead of me right now?"  Pake appears to not have heard that transmission while he was coordinating with another controller.  The request for a block

altitude evidences the difficulties that Zinn was encountering in holding the aircraft's altitude.

87.     At 1855:55 Zinn radioed, in a distressed tone, "five hotel uniform uh you have show, what is the weather is in front of me, I'm a little, uh, in difficult shape here." Pake, who had just mentioned to controller O'Connor that he needed to get back to Zinn who was deviating west, responded "okay, November five uniform uniform, I'm showing you encountering weather at this time, moderate to heavy precipitation slight, uh, actually, uh, extreme precipitation.  Do you need, uh, say intentions."

88.     Zinn responded at 1856:11 "five hotel uniform, give me a heading please." This was the second specific request for assistance that Zinn communicated.  Pake responded at 1856:20 with "okay, five hotel uniform, this is a suggestion only, a suggestion only, I cannot uh issue assigned headings.  20 degrees right please."

89.     This time Pake abided by section 2-6-4's direction to provide assistance to a pilot in weather conditions when requested, though he again incorrectly believed that he could not issue assigned headings under the circumstances.  Section 2-6-4 allows for a controller to do so when requested and the circumstances warrant it.

90.     At 1856:20, Zinn responded "five hotel uniform, roger that, turning." Recorded radar data indicates that the aircraft then turned to the left, rather than to the right as Pake had suggested.  It is more likely than not that this was the result, not of spatial disorientation, but of the pilot's inability to properly control the aircraft now that it was approaching the center of the convective cell.  By this point, almost five minutes after Zinn was encountering the leading edge of this cell to his left at about 10 o'clock, the aircraft more likely than not was almost impossible to control given the

turbulence and wind shear it was flying through. It is also more likely than not that the errant turn was not due to any pre-existing system malfunction, like a defective gyro, as the Defendant's expert theorized.

91.     Unfortunately, the time to make that 20 degree heading turn was at minimum five minutes earlier before the aircraft got any closer to that convective cell. Zinn relied on his own visible perception of the weather ahead of him. This also shows, however, that Zinn was not paying sufficient attention to the stormscope onboard his aircraft that should have been displaying a significant amount of electrical activity at his 9 to 12 o'clock direction. We do not know for sure whether the stormscope was even functioning at the time, though it is more likely than not that it was given Zinn's experience and its availability onboard the aircraft.

92.     Zinn's failure to heed the danger that his onboard data was warning him about, or otherwise his failure to utilize the stormscope device at all, also contributed to Zinn's deviation to a 300 degree heading that led him far too close to the leading edge of a danger convective cell. Pilots are taught and warned not to trust visual appearance as a reliable indicator of turbulence inside a thunderstorm. Zinn neglected to follow that direction as a reasonably prudent pilot would have done under the circumstances.

93.     During his last communication with controller Pake, when Zinn indicated he would make the suggested right turn, the landing gear warning horn can be heard on the recording of the communication. The gear warning horn alarms when the aircraft throttles are retarded. The sound of the gear warning indicates that Zinn more likely than not retarded the aircraft's throttles to idle. Sadly, this too may have been the wrong decision to make under the circumstances.

94.     Pilots are warned that, if they did not properly circumnavigate thunderstorm activity and find themselves inside a storm,  pilots should avoid rapid maneuvers and must maintain the power setting for recommended turbulence penetration airspeed.  It is more likely than not that Zinn did not follow this procedure, counter-intuitive as it may be, and believed instead that a reduction of power would reduce the stress on the aircraft from the effects of the turbulence and wind shear he was encountering.

95.     Shortly after the aircraft continued heading left, the aircraft plunged into a steep and dangerous descent.  Coupled with the G-forces it had already encountered while inside the convective cell, the steep loss of altitude more likely than not further damaged either the control surfaces of the aircraft or the engines onboard, making it even more difficult for the pilot to regain control.  At this point, Zinn began transmitting "help!" and "I am going to die!" messages that could be heard on the ATC recording or by pilots in the vicinity who relayed those messages to the controllers.

96.     The pilot on American Airlines Flight 1968 in particular heard Zinn call out for help numerous times over a two-minute period.   At 1858:59 that pilot communicated to the controllers that "he's not yelling help any more by the way."

97.     After plummeting almost ten thousand feet in a very short time period, Zinn tried to regain control of the aircraft and leveled the aircraft at about 1,000 feet after exiting the convective cell.  Witnesses on the ground observed him maneuvering the aircraft beneath the clouds (between 200 and 800 feet above the ground) for anywhere between one to four minutes.  Zinn was seen by some witnesses with both hands on the yoke, as he was that close to the ground that people could make out the

image of the pilot on the aircraft. Other witnesses heard what appeared to be sputtering sounds from the aircraft's engines. Others still believed that the aircraft was applying full power.

98. In any event, after turning back south, seemingly trying to find a place to land by certain witnesses, he banked to the left in an easterly direction and lost control again. He banked hard left and crashed into a house. The crash destroyed the aircraft and killed Zinn instantly. He suffered severe traumatic crushing injuries along with severe thermal damage from the fire that engulfed the wreckage and the house.

99. Pake tried unsuccessfully to communicate with Zinn for over five minutes. He also alerted other traffic in the area to the "nasty" weather that Zinn had encountered. At 1903:16 he received a communication from a Palm Beach Approach controller that the Stuart tower learned that the plane had gone down. "[S]tuart tower called me and said they saw him at about two hundred feet nose down."

100. Considering all the evidence and authorities submitted at the trial, the air traffic controllers were not reasonable in believing that Zinn had better weather information available to him than what was depicted on the air traffic control radar.

101. Admittedly, air traffic control radar does not detect reduced visibility, lightning, clouds, cloud tops, cloud bases or turbulence. It does, however, provide a controller with close-to-realtime data to inform a pilot of potentially dangerous weather on the route of flight. That information is to be provided when pertinent, especially when a pilot is reaching a point of imminent threat to safety.

102. A controller then has the duty to provide a complete and accurate report of what the controller is observing on his radar screen, even though that information

may or may not be entirely reflective of what the pilot is experiencing. That information may also be potentially time-delayed depending on the speed of the radar returns. But it is still important data that the FAA undertakes to obtain and process for the benefit of the flying public. The controller satisfies the duty of care by communicating that information accurately when it is possible to do so. If the pilot ignores or discounts that information, that is the pilot's risk to assume. The failure to provide complete and accurate weather information, especially when it was requested and clearly required, was a contributing cause of the loss of Zinn and his aircraft.

103.   At the same time, Zinn advised on a number of occasions that he was deviating from his route of flight for weather avoidance, consistent in many cases with the radar data that the controllers had available to them. These various deviations - all selected by Zinn - indicated that he was aware of the weather conditions around him. They also show that he intended to deviate in such a way that it would provide the most minimal disruption of his intended route of flight.

104.   As pilot in command, Zinn was ultimately responsible for its operation. Zinn's duty of care for himself and others required that he do more to avoid convective activity and stay clear of known developing thunderstorms by at least 20 miles. Zinn failed to do so and assumed the risk that ultimately contributed to his loss.

105.   The decision to fly very close to an area of known convective activity, rather than plan a safer route around the weather, violated good piloting practices and was a contributing cause of this tragic accident.

106.   Admittedly, it may be routine in many storm-prone areas for pilots to try and skirt by areas of known convective activity. Usually a combination of luck, skill and

modern technology leave pilots free to fly another day.  Sometimes, however, tragedies ensue.

107.   Michael Zinn died on October 19, 2005.  He was 52 years of age.

## E.   *Economic Damages*

### 1.   *Background*

108.   Zinn was born on December 20, 1952.

109.   Zinn's life expectancy on the date of his death was 22.70 years.

110.   Zinn's expected work life on the date of his death was 17.17 years, until age 70.

111.   Zinn was survived by his daughter, Plaintiff Randi Zinn, born October 10, 1979.

112.   Randi Zinn was 26 years of age when her father died.

113.   Zinn was a skilled and talented entrepreneur and venture capitalist.  From the early 1970's, he was actively involved in the energy and environmental field.  He specifically developed an interest in alternative energy.

114.   For several years he was employed in energy engineering, HVCA, and electrical design and procurement for commercial building projects. He was also the director of a U.S.-funded biomass-to-energy project where he designed and developed a commercial scale animal waste-to-energy plant.

115.   In 1976, Zinn founded a company called Besicorp as an alternate energy technology company.  He was awarded six U.S. patents on heat transfer technologies utilized by Besicorp.

116.   In 1981, Mr. Zinn arranged a public offering for Besicorp and received the Small Business Person of the Year Award from the Small Business Administration.

117.   In 1983, Mr. Zinn initiated Besicorp's entry into the financing and development of small, on-site co-generation projects.  By 1989 Zinn had executed five Power Purchase Agreements (PPAs) with Niagara Mohawk Power Corporation.  A PPA is a contract that requires the public utility to purchase power at a higher-than-market rate.  The PPAs associated with the smaller power plants allowed Besicorp to obtain favorable financing from lending institutions.

118.   For the period 1988 to 1999, Zinn was responsible for the development, operation and ultimate sale of seven power-generating facilities in New York.  These facilities were non-utility generators and were designed to increase competition in the utility marketplace.  The power plants were not profitable in and of themselves, but their above-market rates were attractive for public utility companies.

119.   In 1998, the Besicorp Partnerships received from these companies approximately $1 billion in exchange for terminating the PPAs.  In 1999, the Partnerships sold the related generating assets.  These resulted in a distribution of $127.9 million to Besicorp shareholders.  The power plants themselves were sold for nominal amounts; but the PPAs proved to be very valuable assets.

120.   Zinn, a major shareholder of the company, personally received about $55 million.

121.   That year, Zinn declared substantial wages and bonus income of $2.5 million.  The year before, he had $1.1 million in wage income.  Years earlier, however, his income from wages and bonuses was materially less.  In some years he declared no

taxable income.  After the 1999 sale of Besicorp's PPAs, he declared wage and bonus income of only $5,900 up to the date of his death.

122.    After he cashed out his ownership in Besicorp, Zinn retained a 100% interest in a company he had purchased years earlier, SunWize Technologies LLC, for $200,000.  His ownership interest in SunWize and a significant amount of his capital gain from Besicorp were redeployed into Avalon Ventures, a private venture capital firm he controlled.

123.    Avalon Ventures was intended to continue Zinn's work in energy company ventures.  Zinn cultivated an environmental philosophy that resulted in the support of key environmental and business planning groups in his energy co-generation projects.

124.    From that point and to the time of his death, Zinn through Avalon pursued several different ventures that had the potential to yield future income.  The first entity was SunWize, which was not a company he actively managed.

125.    The second entity was a newsprint recycling facility ("Newsprint Project"), which was designed to generate energy from the purchase and combustion of discarded newspapers and magazines.  The Newsprint Project Plant was unable to get funding and ultimately its plans were canceled.  At the time of its sale following Zinn's death, the project had no value.  In fact Avalon lost approximately $40 million of project cost buildup at the cancellation of the project.

126.    Zinn's estate claims that had Zinn not died he would have been able to save the project by changing the dynamics in such a way that it would have been economically viable and attractive to outside investors, perhaps with a different type of paper output or a different financing configuration.

127.   The Court finds otherwise.   No persuasive or compelling evidence was submitted at trial that the Newsprint Project had a realistic chance of greater success (or lesser failure) had Zinn not been lost.   To the contrary, given what is publicly known about the state of traditional publishing entities and the newsprint they utilized, the decline in availability of such newsprint would have more likely than not yielded the same effect, even if we assume that Zinn's death exacerbated the project's failure. There is no causal connection or relationship between Zinn's death and the failure of this project.

128.   The third entity was a 535 megawatt natural gas fired power plant ("Power Project"), which like the Newsprint Project was also to be located in Rensselaer, New York.

129.   Besicorp had no history of establishing or developing profitable power plants without the favorable terms contained in a PPA.   The Power Project did not have a PPA.   Without a PPA, it is entirely too speculative to find that the Power Project at the date of Zinn's death had a reasonable probability of profitability.

130.   The Power Project had been conceived around April 1999 and development ensued over a six year period under his direction at a total cost of over $80 million.

131.   In the days following Zinn's death, it became apparent that the power plant project could not be taken to completion and would need to be sold.   Development funding was frozen, certain loans and lines of credit went into contractual default due to his death, and multiple vendors with due-on-death clauses in their agreements had stopped or threatened to stop work and demanded payment.

132.    Zinn's death contributed to remaining management being pressured to rapidly secure a transaction for the power plant so that they could recover Avalon's investment quickly and satisfy all of the other potential claimants against Avalon Funding and the estate.

133.    The rights to the power plant project were sold by BEDCO on July 17, 2007 to an unrelated third party for $39 million. Within four months, construction financing for the Project was completed by the new owner.

134.    An appraisal report prepared in anticipation of the estate's tax valuation determined that these projects had "speculative" or no measurable realizable value.

## 2.   Zinn's Proposed Calculation

135.    Despite this speculative pipeline of capital projects, Zinn's estate claims eyebrow-raising net accumulation damages of $17 million in future unrealized salary/bonuses through end of work life and $50 million in future unrealized capital gains that Zinn would have produced.

136.    We will first address the merits and failings of Zinn's damage theory, followed by an analysis of the FAA's contrary, and equally surprising, damage analysis that claims that only nominal net accumulation damages are due, if at all.

137.    With both eyebrows raised by each sides' extreme positions, we then reach our own assessment as trier of fact of the maximum net accumulation damages recoverable in this case under Florida law.

138.    Zinn's calculation is based upon the expert opinion of a respected and experienced forensic economics consultant, Dr. John A. Swiger.  Like the FAA's expert,

Dr. Swiger presented a thorough and good faith analysis of the factual record supporting Zinn's damage theory. But as Dr. Swiger conceded at trial, economic valuation is not a scientific endeavor. By definition, it is based upon assumptions and expectations that can be affected by a multitude of factors. That difficult exercise is particularly complex in a case like this involving a person of substantial income who is not a regularly salaried employee. Zinn was a venture capitalist and entrepreneur whose projected income on an annual basis is intrinsically difficult to measure. Dr. Swiger explained that two reasonable and knowledgeable economists, looking at the same set of facts, may yield quite different conclusions. That is what we are presented with here.

139. After thoroughly examining, comparing, and contrasting the two experts' methodologies presented at trial in this case, we find overall that Dr. Swiger's analysis is the least reliable from a factual basis, at least without substantial adjustments. This assumes that it is even legally viable under Florida law. The primary reason for the Court's finding is the overly simplistic and incomplete nature of the methodology employed.

140. First, with respect to the salary and bonus component of Dr. Swiger's analysis, the expert concluded that Zinn, had he not died, would have received an average salary and bonus income of $912,425 per year from date of death to end of worklife at age 70. The gross future value calculation for this annual income yields a total of $17,118,378, 74% of which would have accumulated in the estate at the time of natural death.

141.    That analysis is flawed from the start because the average used for the $912,425 yearly income number is based only from a five year period, between 1995 and 1999, which represents the *highest* five-year period of income that Zinn received in actuality.  Had he taken an average of the preceding five year period prior to death, which is more customary in cases like this, Dr. Swiger would have been averaging a total income of $5,900.

142.    Naturally, it is more likely than not that Zinn's income over the course of his work life would have, at certain points, far exceeded $5,900.  But so too is it incredible to find that an annual average salary of $900,000 was more likely than not. Dr. Swiger's analysis is therefore unreliable to the trier of fact when it comes to the calculation of salary income.[6]

143.    Had a more reliable and actual average been taken by the expert of Zinn's income over the course of a broader period of time, 1995 through date of death for instance, the average the expert would have arrived at was $533,026 based on a total salary and bonus income of $5,859,787.

144.    If a simplistic averaging analysis was to be applied in this case, that actual average income over a ten-plus year period would be the most reliable barometer of average annual income from which to draw a final conclusion.

145.    We find, however, that a simplistic averaging analysis is also flawed. Zinn was a venture capitalist in a high risk business.  He would have yielded many

---

[6]    That is unless the elevated salary income is intended to address other elements of damage that the estate would have suffered, which is ultimately what the Court's Findings adopt in section I.E.4 below.

successful years, coupled with many lean years when no taxable income was ever realized. We know that to be the case given the preceding five years prior to his death. He was not generating any material taxable income during that period but not because he was being lazy. He was working actively on projects that, if successful, would yield material sums at different points. To take any period of time of real data, average the income over that time, and multiply it forward does not take into account the risk/higher possible reward that was more likely than not possible for an entrepreneur like Zinn.

146.   The FAA's expert's calculation of future salary was closer to what is reasonable under the circumstances. But that calculation is also flawed, which is a matter that we deal with below. But for purposes of Dr. Swiger's analysis, we reject the proposed lost salary calculation as a factual matter.

147.   Second, the bulk of Dr. Swiger's calculation of net accumulations to the estate revolves around anticipated capital gains that Zinn would have received over the course of his work life. Dr. Swiger concludes that, based on average capital gains of $3,900,000 earned during the 23 years of Zinn's work at Besicorp, the estate would have accumulated 74% of $49 million to $50 million in capital gains.

148.   We agree with the FAA that, under the circumstances of this case, any capital gains calculation for Zinn's estate is entirely too speculative and indefinite to include in a reliable valuation. At the very least, *this* capital gains calculation is clearly unreliable, overly speculative, and too indefinite.

149.    The vast majority of the $3,900,000 annual average is the result of the $51 million in proceeds that Zinn obtained from the sale of Besicorp.  Despite years of work in the alternative energy business, he never obtained any such business income prior to 1999, nor any such income or gains after it.  That illustrates the uniqueness and isolated nature of that particular gain, which then skews Dr. Swiger's entire analysis.

150.    Hence, the averaging of all capital gains obtained during the course of Zinn's ownership of Besicorp is too simplistic and, contrary to Zinn's position here, *not* indicative at all of possible future performance.

151.    The flaws with the analysis do not end there.  Third, both the salary and capital gains components of Dr. Swiger's analysis fail to actually calculate a net accumulation rate in a traditional manner.  Instead, Zinn's expert calculates the average expected income over his work life and makes isolated minimal deductions for Zinn's consumption of all that income plus taxes.

152.    Dr. Udinsky, the FAA's expert, on the other hand conducted a traditional net accumulations analysis that determined historically the rate of accumulation that Zinn left to his estate before his death, and extrapolated from that calculation how future income would be accumulated.

153.    We find that Dr. Udinsky's calculation is more reliable under the circumstances because it, more likely than not, results in a more accurate and reliable calculation.  At the very least, we find that Dr. Swiger's analysis would require material modifications to obtain a reliable result.

154.   Dr. Swiger's failure to conduct and apply that or similar analysis leaves his final conclusions incomplete.

155.   That failure, naturally, has a material impact on his conclusions. The vast majority of anticipated capital gains in Dr. Swiger's analysis will purportedly be left in the estate. Putting aside the flaws in that analysis from a legal perspective, as a factual matter it defies common sense. It assumes that, even though Zinn's work was in highly risky and uncertain energy ventures, a 95% rate of return on investment was likely. We know that is not the case nor could be the case.

156.   Take, for instance, the last five years preceding his death. During that period, after having reached a successful end to his Besicorp project, Zinn did not actually obtain anywhere near $3.9 million in net capital gains. To the contrary, his investments in his new projects led to losses, not gains, as his tax returns readily display over that period of time.

157.   To boot, we know that the result of the efforts during those five years led to two failed projects that, as Zinn's estate concedes, lost a substantial sum of money. The net result was an utterly worthless entity by the time it was sold. That hardly illustrates an average capital gain of $3.9 million.

158.   To be fair, Zinn's continuing work in those projects could – *could* – have resulted in success. But the point remains the same. Taking the high water mark of an entrepreneurial life, and then simplistically multiplying it over a period of time and reducing it to present value is not sufficient. There must, at the very least if capital

gains of this nature are to be calculated, some measure of the very real risk of losses built in to the equation.

159.    Having failed to conduct a realistic measure of those losses, Zinn's estate cannot meet its burden to show that Dr. Swiger's final conclusions should be adopted.

160.    Calculating a net accumulation rate based on actual historical data, which properly measured compares the difference between the value of an asset or investment at given points in time and computes the net impact that a decedent's income has on a future estate, would be one way to measure the risk of loss.  Dr. Udinsky's calculations in his methodology calculates an 18.98% accumulation rate when taking account all income and net value to the estate.  Dr. Swiger conducted no similar analysis, nor really challenged that calculation.

161.    Dr. Swiger defended his opinion at trial by contending that the 7.5% or 9.5% discount rate he utilized was in fact designed, in part, to take into account those risks.  The problem is that, as a matter of fact, the Court cannot accept that opinion as persuasive or credible.  The bulk of this calculation in Dr. Swiger's analysis is to bring the average $3.9 million capital gain, plus 2% growth, to a present value.  A discount rate of this kind is, for the most part, a present value calculation of a given source of income or investment, including especially the effects of inflation on that income.

162.    Moreover, the Court's finding is further supported by the fact that, as Dr. Swiger conceded, the authority that he relied upon to apply those discount rates came from historical average returns of equity to shareholders for public utility companies like Consolidated Edison in the New York area.  This aspect of Dr. Swiger's analysis proved fatal to the expert's credibility.  One cannot possibly find that, more likely than

not, the type of energy company ventures Zinn was developing at time of death at all equates to a publicly owned and publicly regulated entity like a traditional power utility.

163.    Unlike such a company, Avalon was a privately held company.  That by definition carries far more risk based on a reduced market for diversified ownership. Unlike Con Edison, Avalon has no track record of real profits and returns over decades. Unlike Con Edison, Avalon is in fact a start up venture that inherently has a high risk of failure.  And, unlike Con Edison, Avalon's future success is not at all guaranteed by a utility regulatory process that generates a market, customers, and guaranteed rates of return on investment.  Avalon, or the types of energy co-generation projects Zinn was trying to develop, could not possibly be more different.

164.    As a result, Dr. Swiger's failure to use a realistic discount rate – one that would be expected for startup ventures with medium or high risk of failure – cast a pall on the credibility of his analysis, leaving the Court will little faith in its outcome.

165.    Again, if we assume that any specific award of capital gains was even possible to some degree of reasonable certainty, the averaging of a high-water gain over the course of Zinn's working life would have to be discounted at levels two or even three times greater than what Dr. Swiger posited.  That, of course, would materially reduce that $50 million calculation.  And, on top of that, a realistic historical accumulation rate applied to that revised gross calculation would reduce it even further – to a more reliable level that would support the outcome under the law.

166.    When the Court conducted that revised analysis, *infra,* the net result was indeed quite close to, though slightly less, than the revised calculation using Dr. Udinsky's methodology.  That is not surprising given the risks inherently involved in ventures such as this.

167.    Fourth, and finally, another flaw in Dr. Swiger's analysis is the failure to persuade us on how he differentiated active income from capital gains from passive income, which Zinn concedes are not recoverable under Florida's wrongful death statute.  Our review of the underlying data shows that much of what is included in the average $3.9 million in capital is arguably passive.  But even conceding that there could be some percentage of Zinn's overall capital gains that could be deemed active, which flow from a product of his business acumen and work rather than traditional investments in markets that the estate will continue to profit from despite his untimely death, Dr. Swiger did not persuade us that his calculation properly took that into account.

168.    We note, for instance, that the successful sale for profit of the estate's interest in SunWize, is touted by the estate as evidence of Zinn's business knowledge and success.  Yet, both experts deemed that sale a passive investment and, specifically, Dr. Swiger did not include the proceeds from that sale in his calculation.  If one eliminates that from the calculus, it is hard to understand why much of the $50 million in unrealized capital gains should not also be discounted for similar passive investments that Zinn may have made to achieve that gross number.

169.    In other words, how can the Court be certain that the average $3.9 million in annual "lost capital gains" that Dr. Swiger includes in his analysis are not future SunWizes – largely passive investments in companies that then yield successful outcomes.  As a matter of law, such passive investments are not recoverable.  Yet, Dr. Swiger's projections shed no light on how the Court could measure only the active income elements of future capital gains in its net accumulation calculation.   His conclusory testimony at trial on this point was highly unpersuasive.

170.    In sum, we find that Dr. Swiger's methodology and analysis, which we concede again was not entirely illogical, is not sufficiently reliable or credible without substantial modification under the limitations of Florida law.

### 3.    FAA's Reasonable Compensation Calculation

171.    Though the Court has rejected wholesale application of the Zinn estate's expert's methodology, we turn now to consider whether we will rely in whole or in part on the FAA's proposed methodology.

172.    The FAA relied upon an equally impressive forensic economist, Dr. Jerald Udinsky, who like Dr. Swiger conducts forensic evaluations of lost earnings and income.

173.    Dr. Udinsky credibly testified that the methodology utilized by Dr. Swiger was flawed and unreliable.  The Court agrees.

174.    Dr. Udinsky then posited that the only reliable method of evaluating Zinn's future lost earnings was through a reasonable compensation method that identified an imputed income for Zinn over his work life reduced to present value.

175.    Dr. Udinsky credibly testified that such a formula was a more reliable means to account for Zinn's historical business acumen and possible potential to create wealth in the future.   An imputed income – also referred to as a reasonable compensation or earnings capacity – is the reasonable value of Mr. Zinn's productivity in the marketplace.

176.    Relying on the MPI Appraisal Report that described Avalon Ventures as an investment holding company (not a public utility company or a company engaged primarily in the generation of electricity as Dr. Swiger suggested), coupled with the fact that Avalon Ventures was described by the estate as a venture capital firm and Zinn as venture capitalist, Dr. Udinsky assigned to Zinn an average annual compensation of a CEO of a comparably-sized holding company and venture capital firm.

177.    Dr. Udinsky concluded that Zinn's reasonable compensation was $675,470 per year, based upon historical analyses of median holding company/investment managers' salaries and bonuses in the State of New York.

178.    The reasonable compensation of $675,470 per year assigned to Zinn seeks to incorporate the balance between the possibility that his future business endeavors might have been successful against the possibility that his future business endeavors might have been failures.

179.    He then analyzed, based on historical data, what Zinn's Net Accumulation Rate was.   Dr. Udinsky's analysis yielded a rate of 18.98%.

180.    The net accumulation rate is the percentage of earned income that is added to an estate.   For example, if an individual earns $100 and $20 from this amount

accrues to the estate, the net accumulation rate is 20%. Such a calculation is highly relevant to a net accumulation analysis under Florida law.

181.    Dr. Udinsky's calculation for Zinn's net accumulation rate involved:

(i) the value of his Estate at two points over a reasonable period of time; and

(ii) Mr. Zinn's total non-passive earning over the same period of time.

182.    The value of Zinn's estate in 2007 was $27,189.824. The estimated value of Zinn' estate in 1995 was $14,048,981.

183.    The difference between the value of the estate in 1995 and 2007 was an increase of $13,140,843.

184.    Zinn's total active income from 1995 to 2007 was $69,218,145.

185.    Dividing Zinn's total active income from 1995 to 2007 by the increase in the value of his estate during the same period results in a net accumulation rate of 18.98%. This means that for every $100 earned by Zinn prior to his death, $18.98 accrued to the estate.

186.    The rest of the earned income is used for further business investments, business expenditures, taxes, personal expenses, and other uses that do not accrue to the estate.

187.    The Court's analysis of Dr. Udinsky's methodology and the assumptions underlying it show that it is, in the main, reliable and a reasonable measure of compensation for a high earner like Zinn. That same analysis shows, however, that Dr. Udinsky's calculations are not altogether correct in this case.

188.    First, though the expert's ultimate calculation of a net accumulation rate was sound based upon the underlying data available in this record, we note that the net

rate is a post-tax rate. In other words, that rate includes reductions in the estate's income from applicable taxes. It is truly a net rate.

189. Yet, Dr. Udinsky applies that rate to an average imputed salary to Zinn over the course of his lifetime that is itself reduced by the effect of taxes. By doing so, Dr. Udinsky's final conclusion, which yields $1.3 million in future earnings over ten years, is double-dipping. It is applying the net rate to income that has already been reduced to a post-tax amount.

190. Second, and more materially, the Court finds that Dr. Udinsky's application of that particular accumulation rate to the imputed salary/bonus income here is mixing apples and oranges. That is because the net rate includes deductions to the estate from capital losses, reinvested capital gains that did not directly benefit the estate, and other net calculations of all possible income to the estate.

191. The imputed salary calculation, however, expressly discounts and excludes actual capital gains and losses, precisely because Dr. Udinsky concludes those projected gains are too speculative to be relied upon. But to apply a net accumulation rate to the imputed salary, which rate is so low based upon gains and losses historically suffered by the estate over time, is unfairly deducting losses from the imputed salary that would never be suffered under this analysis.

192. In other words, if we are not going to give the estate the benefit of projected capital gains in the future, we cannot deduct from the estate the effect of losses in the past that would not be suffered in this calculus.

193. The net accumulation rate that Dr. Udinsky found would indeed be better applied to Dr. Swiger's analysis. That is because it would then be doing an apples-to-

apples analysis.  (And in fact we do apply it below to determine the viability of Dr. Swiger's methodology here).

194.    Third, the Court's review of the scholarship and authorities that Dr. Udinsky relied upon shows that the formula he applied to the imputed salary to determine future and present value already accounts for projected savings and consumption.  That formula, which the Court replicated as best it could, is measuring in part a net accumulation.  We do not see, however, where the authors of that article are applying the net formula to income that has already been reduced to a net value through application of a net accumulation rate like this one.

195.    It is, in fact, originally designed to projected income for young people who, because of death, were never able to generate real incomes over a working life.  Thus, no historical accumulation rate is possible in those cases.  Thus, the formula utilized in that analysis is accounting for consumption and savings by the decedent through the end of life expectancy.

196.    Though the general methodology of that scholarly paper can be applied here, it *cannot* be applied without appropriate adjustments given a decedent who did accumulate a historical track record of income and consumption.  And one adjustment that should not have been made was Dr. Udinsky's application of a historical accumulation rate to the formula contemplated in the paper to achieve a net accumulation.  In other words, this too is an instance of double-dipping that needed to be revised to achieve a more reliable and fair calculation.

197.   Fourth, if one were to separately apply a net accumulation rate as Dr. Udinsky does, it would have to be much higher than 18.98%.  That is because we know at time of death that Zinn achieved a substantial nest egg for him and his family following the sale of his Besicorp interest.  Though much of that was reinvested in his new ventures, a substantial portion of that $50 million was used to create passive investment accounts that had more than enough assets for Zinn's regular consumption (and then some).

198.   Hence, even though we are not projecting future unearned capital gains per se, we cannot ignore that those past capital gains already exist and are, more likely than not, not going to be dissipated over the course of Zinn's expectant life span.  Those passive investments would have been available to Zinn through the end of his work life and then through the end of his life.  Though we do not agree that he was as frugal as the estate suggests, we also do not find that he was a spendthrift.  Thus, his history of consumption shows that he was not over-extending himself.

199.   We can thus project that at time of retirement Zinn would even have less consumption than at time of death.  Therefore, a net accumulation rate that is greater than 90% (and exclusive of taxes that are being deducted separately) is not tenable.  In this respect, Dr. Swiger's personal expenditure rate is more appropriate for an imputed salary analysis.

200.   This is also true because the risk and cost of capital that Zinn would have realized to achieve the imputed salary would also have originated from past capital gains that he had achieved before his death.  These expenses also cannot be applied to

the imputed salary calculation. Thus, Dr. Udinsky's calculations would have to be revised to yield a more reasonable compensation amount.

201.   Fifth, an important element of Dr. Udinsky's calculation is to achieve a more reliable measure of wealth accumulation by an entrepreneur like Zinn. The fact that we have rejected an averaging and projection of capital gains, as Dr. Swiger suggests, does not mean that we do not agree that we must account for the possibility of greater gains to the estate than an average salary of similar executives. Under this methodology, the imputed salary must be significant enough to achieve some reasonable compensation to the estate for the type of business acumen and profit generation that people like Michael Zinn can achieve.

202.   The imputed average salary of a joint venturer/investment manager that Dr. Udinsky utilized – $675,470 plus 4% growth – is for an average joint venturer. Zinn was not an average joint venturer. He proved to have a keen sense for the industry he was involved in and, more likely than not, would have achieved future success. The fact that we cannot measure that by simplistic averaging of past gains does not mean that we should not seek out some way of compensating the estate for this loss with some reasonable certainty.

203.   The same source of data that Dr. Udinsky relied upon showed that the maximum salary of comparable Chief Executive Officers was $1.2 million (twice the amount Dr. Udinsky utilized). We find that this higher salary is more likely than not closer to reality and better reflects the likely salary stream that Zinn would have achieved.

204.   That amount also is even greater than the average salary that Dr. Swiger utilized in his calculation.  That is appropriate because we are not adding to that salary speculative capital gains as Dr. Swiger does.

205.   Sixth, the Court finds it more likely than not that Dr. Udinsky's assumption of Zinn's work life is incorrect.  Dr. Udinsky assumes that Zinn would have started to "slow down" well before age 70.  Dr. Swiger assumes that Zinn would have worked to age 70.  We agree with Dr. Swiger on this point.  Dr. Udinsky's explanation for why he assumed a shorter work life was not persuasive.

206.   We know from experience that driven and entrepreneurial businessmen like Zinn regularly work beyond normal retirement.  In fact, as we are assuming an imputed salary for a CEO of an investment holding or joint venture company, that position is undoubtedly capable of being performed by persons of that age.[7]

207.   Accordingly, that adjustment to Dr. Udinsky's calculations must also be conducted to achieve a truly reasonable compensation measure for Zinn's estate.

### 4.   Court's Final Calculation of Net Accumulation to Estate

208.   Pursuant to these findings, we turn finally to the Court's own calculation of a compensable net accumulation award to the estate.  To reiterate, Zinn's estate has not met its burden of persuasion to show that any net accumulation award beyond the revised Udinsky calculation is possible given this record.

---

[7]    Though we acknowledge that this is technically not in the record, the most successful "investment manager" in the country is 81 years old.  He does not appear to be slowing down.  It is more likely than not that Zinn would not have either. Conservatively, we find that he would at least have generated full income through age 70.

209.   That revised calculation results in a total net income to the estate of $7,910,072.15.  For the reasons explained above, we increased the annual salary to the maximum of $1,200,000.  That salary was adjusted for a 4% growth rate.  It was then reduced by applicable taxes at  the average tax rate of 24.98%.  It was then reduced by 10% for consumption that would have come from Zinn's salary and bonus income.  The future values of those amounts were then reduced to present value.[8]

210.   The Court's calculation is set forth in the following chart:

_____

[8]      Given the Court's lack of mathematical acumen, we assume some error in the formulas used or the calculations.  We believe, however, that any such errors are not material to the overall conclusion.

| | Annual Salary | 4% Growth Adjusted | Tax Adjusted | 90% Net to Estate | Net Future Values |
|---|---|---|---|---|---|
| 2005 | 1,200,000 | 1,200,000 | 900,240 | 810,216 | 879,327 |
| 2006 | 1,200,000 | 1,248,000 | 936,250 | 842,625 | 906,917 |
| 2007 | 1,248,000 | 1,297,920 | 973,700 | 876,330 | 935,307 |
| 2008 | 1,297,920 | 1,349,837 | 1,012,648 | 911,383 | 964,516 |
| 2009 | 1,349,837 | 1,403,830 | 1,053,153 | 947,838 | 994,567 |
| 2010 | 1,403,830 | 1,459,983 | 1,095,280 | 985,752 | 1,026,167 |
| 2011 | 1,459,983 | 1,518,383 | 1,139,091 | 1,025,182 | 1,057,988 |
| 2012 | 1,518,383 | 1,579,118 | 1,184,654 | 1,066,189 | 1,090,178 |
| 2013 | 1,579,118 | 1,642,283 | 1,232,041 | 1,108,837 | 1,123,806 |
| 2014 | 1,642,283 | 1,707,974 | 1,281,322 | 1,153,190 | 1,162,416 |
| 2015 | 1,707,974 | 1,776,293 | 1,332,575 | 1,199,318 | 1,199,318 |
| 2016 | 1,776,293 | 1,847,345 | 1,385,878 | 1,247,290 | 1,247,290 |
| 2017 | 1,847,345 | 1,921,239 | 1,441,313 | 1,297,182 | 1,297,182 |
| 2018 | 1,998,088 | 2,078,012 | 1,558,924 | 1,403,032 | 1,403,032 |
| 2019 | 2,078,012 | 2,161,132 | 1,621,281 | 1,459,153 | 1,459,153 |
| 2020 | 2,161,132 | 2,247,577 | 1,686,133 | 1,517,519 | 1,517,519 |
| 2021 | 2,247,577 | 2,337,481 | 1,753,578 | 1,578,220 | 1,578,220 |
| 2022 | 2,337,481 | 2,430,980 | 1,823,721 | 1,641,349 | 1,641,349 |

**TOTAL OF FUTURE VALUES**     $21,484,252

**PRESENT VALUE**     $7,910,072

211.    To be safe, we also decided to project lost capital gains, notwithstanding the Court's earlier finding that a direct calculation of such gains was too speculative under Florida law, as an alternative to the imputed salary calculation. We did so, however, with the adjustments discussed above that were required to correct the inaccurate and incomplete assumptions inherent in Dr. Swiger's calculations.

212.    Utilizing the same average annual capital gain of $3,900,000, adjusted at a 2% growth rate, the Court applied a much greater discount rate. Dr. Swiger applied a 7.5% or alternative 9.5% discount rate to his calculations that resulted in a total proposed present value of $49 to $54 million. If, instead, a more appropriate 20% discount rate was applied to those future amounts (to better account for the much

higher risks involved in Zinn's energy industry ventures and the likelihood of losses along the way), the pre-tax present value of those annual gains is reduced to $44,227,688. Applying a 25% tax rate to that amount, the net present value of the projected annual capital gains becomes $33,170,766.

213. Further, unlike Dr. Swiger, we conclude that a true net accumulation rate would have to be applied to that net present value calculation. Dr. Swiger, instead, simply assumed a reduction of 5% for personal consumption. As the Court has found, however, such an adjustment grossly underestimates the actual net accumulation that the estate would have realized, more likely than not, over Zinn's working life.

214. We also found that Dr. Udinsky's net accumulation calculus (which was based on all Zinn income including capital gains and losses) was necessary to determine a reliable capital gain calculation. Dr. Udinsky's 18.98% accumulation rate was then adjusted to 20.54% to take into account the double-dipping problem addressed above.[9]

215. Once a real accumulation rate is applied to the net present value to determine the actual amount the estate would have received from Zinn's capital gains, this results in a total of $6,813,275.

---

[9]   Dr. Udinsky's calculation compared the difference in the value of the estate between 1995 and 2005 and divided that by the estate's post-tax net income from that same period, resulting in a post-tax accumulation rate. To identify the segment of that net rate attributable to taxes, we calculated the difference in the accumulation rate if we incorporated the pre-tax income to achieve an accumulation rate. We added that difference to Dr. Udinsky's 18.98% rate, resulting in an accumulation rate of 20.54%. That is the rate that should be applied to future earnings projections that have already been reduced to a net post-tax amount. Otherwise, applying Dr. Udinsky's accumulation rate to post-tax future earnings would inaccurately heighten the effect of taxes on the income stream.

216.   And even if we added on top of this an average annual salary, based on Zinn's actual average salary over the ten years prior to his death (as opposed to Dr. Swiger's fictional $912,425 amount), that adds only an additional net present value of $680,069 to this earnings calculation.  When this amount is combined with the capital gains projection, the grand total damage award using Dr. Swiger's methodology, adjusted for reliability, would be $7,493,344.

217.   Hence, if we apply an imputed salary calculation to achieve a reasonable compensation model, the estate benefits the most from that calculation as compared to the average salary and capital gains earnings properly adjusted for risk and true net accumulations.  Notably, the fact that both modified approaches produce very similar outcomes bolsters the Court's ultimate conclusion.  In the final analysis, we find that it is more appropriate to award the greater amount, using Dr. Udinsky's revised methodology, for the reasons stated above.

### 5.  Funeral Expenses

218.   There is no dispute that the estate incurred a direct cost for funeral expenses of $15,757.  That amount must be added to the net accumulation award to achieve a complete economic damages amount of $7,925,829.15.

### F.   Non-Economic Damages

219.   The Decedent and his daughter, Randi Zinn, had a close and loving relationship in which Zinn provided meaningful and much needed love, companionship, comfort, care, assistance, protection, affection, society and moral support.  Zinn was active in all aspects of Randi Zinn's life.

220.   Randi Zinn worked for her father's company, Besicorp, one summer during college and she worked for M.D.P. Productions, a production company associated with Besicorp, for approximately three years after her college graduation.

221.   Zinn provided financial support to Ms. Zinn for most of her life.  He paid her college tuition, as well as her living expenses.  After her college graduation, he provided financial support to her while she interned for a company in New York City.

222.   As a result of her father's death, Randi Zinn has suffered lost parental companionship, instruction, and guidance.

223.   Although it is always difficult to reduce such a relationship to monetary terms, the Court as trier of fact must do so to achieve a reasonable sum that compensates a decedent's lost companionship and relationship with her father.

224.   The Court finds that a total sum of $3,000,000 is a just and proper award under the circumstances.

## II.   CONCLUSIONS OF LAW

### A.   *The FAA's Negligence*

This action is properly brought in this jurisdiction under the Federal Tort Claims Act, 28 U.S.C. §1346(b) ("FTCA").  Section 1346(b) provides in relevant part that the United States shall be liable for personal injury, death or property damage caused by the negligent or wrongful act or omission of a federal government employee in accordance with the law of the place where the act or omission occurred.

The alleged acts of negligence occurred in Florida and the parties agree that, under the FTCA, Florida substantive negligence law applies in this case.  *See Daley v.*

*United States,* 792 F.2d 1081, 1085 (11th Cir. 1986) ("the law is that 'liability growing out of the operation of aircraft is to be determined by the ordinary rules of negligence and due care.' . . .'The duty to exercise due care to avoid accidents is a concurrent one resting on both the control tower personnel and the pilot.' [T]he applicable law governing the liability of the United States for the acts and omissions of its air traffic controllers is that of Florida. The duty owed is, therefore, Florida's 'traditional . . . standard of reasonable care, that which a reasonably careful person would use under like circumstances.'") (citations omitted); *see, e.g., Himmler v. United States,* 474 F. Supp. 914, 929 (E.D. Pa. 1979) ("In suits for injuries sustained in air crashes, no special rules are applicable only to airplanes. Rather, the general rules of negligence apply. Therefore, the tort standards of duty, the breach of the same, and causation remain as in any tort case.").

Under Florida law, a defendant is negligent when there is: (1) a duty recognized by law requiring the defendant to conform to a certain standard of conduct; (2) a failure to conform (i.e. a breach) to that standard; (3) cause in fact and a reasonably close causal connection between the conduct and the injury ("legal" or "proximate cause") and (4) actual loss or damages. *See Clay Electric Coop., Inc. v. Johnson,* 873 So. 2d 1182, 1185 (Fla. 2003); *Palma v. BP Prods. N. Am., Inc.,* 347 Fed. Appx. 526, 527-28 (11th Cir. 2009).

### 1. *Duty*

The duty owed by an Air Traffic Controller to a pilot is a question of law. *Daley,* 792 F.2d at 1085. Duty for purposes of a negligence claim encompasses concepts of

foreseeability and may arise from: (1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments and regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case. *Clay Electric,* 873 So. 2d at 1185. Florida recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others. *McCain v. Florida Power Corp.,* 593 So. 2d 500, 503 (1992). The greater the risk created by the defendant's chosen activity, the greater the defendant's duty to avoid injury to another. *United States v. Stevens,* 994 So. 2d 1062, 1067 (Fla. 2008); *Daley,* 792 F.2d at 1085.

Whenever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the service thereby assumes a duty to act carefully and to not put others at an undue risk of harm. *Clay Electric,* 873 So. 2d at 1186; *see, e.g., Ingham v. United States,* 373 F.2d 227, 236 (2nd Cir. 1966) (the government's decision to provide weather information induces pilots to rely upon this service, and in light of this reliance, the government must properly perform those services it has undertaken to provide).

The FAA here had a duty to exercise reasonable care. The FAA's controllers undertook to provide a service and thereby assumed a duty to act carefully and not to put Zinn at undue risk of harm. This duty arises from the FAA's own regulations, principally FAA Order 7110.65P, as well as from common law duties as to what a reasonably prudent person would have done when faced with an aircraft asking to deviate directly into severe weather. *See Daley,* 792 F.2d at 1085 ("The duty owed is,

therefore, Florida's 'traditional standard of reasonable care, that which a reasonably careful person would use under like circumstances.'"); *see, e.g., Abrisch v. United States,* 359 F. Supp. 2d 1214, 1226 (M.D. Fla. 2004) ("The duties of air traffic controllers are set forth in the Air Traffic Control Manual (FAA Order 7710.65), and, although those guidelines are evidence of the standard of care in the industry, an air traffic controller's duties are supplemented by the general duty of care owed under the circumstances.").

In *Daley,* the Eleventh Circuit found that reasonable care by air traffic controllers requires reasonable compliance with the United States's own self-imposed standard of care as spelled out in its air traffic control manual. 792 F.2d at 1085. Moreover, in formulating the duty owed, the circumstances confronting the aircraft, such as whether it is experiencing an emergency situation or in this case whether safety situation exists, must be taken into account. *Id.* ("[district] court's recognition that the duty of care owed is commensurate with the risk involved is in accord with Florida law.").

It is thus understood that the duty required of an air traffic controller is higher to match the high level of risk involved. *See, e.g., Himmler,* 474 F. Supp. at 928 ("What might be held to meet the ordinary standard of care in some other situations does not necessarily measure up to ordinary care in an air traffic control room where, as the courts have noted, there is always the possibility that tragic accidents may occur in a matter of seconds if controllers who assume a high responsibility, relax from constantly overseeing an aircraft to promote its safety in flight"); *Webb v. United States,* 840 F. Supp. 1484, 1511 (D. Utah 1994) (controllers "assume a higher degree of responsibility and their duty of care rises accordingly").

In this case, FAA Order 7110.65P, section 2-1-1, provides that the issuance of weather information, although an additional service of ATC, "is required when the work situation permits."  With respect to weather, controllers are to "[b]ecome familiar with pertinent weather information when coming on duty, and stay aware of current weather information needed to perform ATC duties."  *Id.* section 2-6-1.  Controllers are to "[i]ssue pertinent information on observed/reported weather or chaff areas;" and "[p]rovide radar navigational guidance and/or approve deviations around weather or chaff areas when requested by the pilot."  *Id.* section 2-6-4.  And when issuing weather, controllers are to issue the weather by "defining the area of coverage in terms of azimuth (by referring to the 12-hour clock) and distance from the aircraft or by indicating the general width of the area and the area of coverage in terms of fixes or distance and direction from fixes, . . ."  *Id.* section 2-6-4.  For example, controllers are to state: "Level four weather echo between ten o'clock and two o'clock, one five miles. Weather area is two five miles in diameter."  Importantly, section 5-6-1 also provides for the vectoring of aircraft in controlled airspace for "safety" reasons.

In addition to the FAA's own operating manual, an air traffic controller is required to "warn of dangers reasonably apparent to him, even beyond the requirements in the manual, if those dangers are not apparent to the pilot in the exercise of due care." *Springer v. United States,* 641 F. Supp. 913, 935 (D.S.C. 1986).  In accord with their primary duties, controllers have a duty to accurately report current and changing weather conditions to pilots.  *See Worthington v. United States,* 21 F.3d 399, 406 (11th Cir. 1994) (finding that spatial disorientation was proximately caused by negligence of

air traffic controllers in failing to give pilot "accurate and timely information about weather conditions"); *see, e.g., Ingham,* 373 F.2d at 233; *Abrisch,* 359 F. Supp. 2d at 1228 (controllers have a duty to provide pilots with timely, accurate weather); *Webb,* 840 F. Supp. at 1511 (to fulfill the government's duty to provide a pilot with requested weather information, a controller must provide an accurate and complete response); *see also Gill v. United States,* 429 F.2d 1072, 1075 (5th Cir. 1970) (controllers have duty to exercise reasonable care in providing current weather information and forecasts to pilots).

The scope of the duty owed by the government to pilots includes suggesting appropriate action to avoid storm areas when possible and necessary. "[T]he government has undertaken to suggest to pilots appropriate action to avoid storm areas, and performance of this duty requires that suggestions by controllers be proffered with reasonable care." *Gill,* 429 F.2d at 1076. *See also Himmler,* 474 F.2d at 931, 943 ("The controller has a duty to exercise judgment to attempt to avoid danger where such danger was, or should have been, obviously imminent under the circumstances. . . . A controller has a duty to attempt to dissuade an actor from committing a negligent or a grossly negligent act by providing a warning.").

FAA Order 7110.65P, section 1-1-1 provides that, with respect to duty priority, controllers are to give first priority to separating aircraft and issuing safety alerts, but also that "[g]ood judgment shall be used in prioritizing all other provisions of this order based on the requirements of the situation at hand." *Id.*, section 2-1-2. To this end, the

Note to section 2-2-2 states that any "action which is most critical from a safety standpoint is performed first."

The FAA's controllers who handled Zinn's flight, as a matter of law, owed these duties to Zinn and all other persons relying upon their services on October 19, 2005.

## 2. *Breach of FAA's Duties*

The FAA does not directly challenge the existence of these duties for air traffic controllers under FAA Order 7110.65P and decisional caselaw applying those regulations. The FAA takes issue, however, with the claim that its controllers breached those duties in this instance. Fundamentally, the FAA maintains that weather advisories and assistance is secondary to the controllers' primary responsibility of separating aircraft. And in this case the FAA contends that these controllers were engaged in that primary responsibility but still provided weather briefings to the extent it was possible. Finally, the FAA takes the position that the weather briefings provided satisfied the controllers' duty of care in relation to Zinn's flight.

The Court's Findings of Fact *supra* agree with respect to the South Arrival, North Departure, Palm Beach Approach and Miami Center controllers other than Harvey Pake. The Court concluded that these controllers did not breach their duty of care because primary services, like initial clearance or frequency handovers, precluded more detailed briefings. Or, the Court found that weather briefings in the form Zinn demanded were not required as they were not immediately pertinent to Zinn's route of flight. Alternatively, even if these controllers breached their duty of care in some respect, the weather advisories that were available to the controllers provided Zinn with

no new information that he was not already fully aware of, thus precluding a finding that such breaches caused in fact or proximately caused Zinn's loss.[10]

The FAA's defense of the case becomes more problematic, however, with respect to controller Harvey Pake, who worked the aircraft during the most relevant period that led up to the crash.  The Court's Findings make clear that Pake breached his duty of care in providing complete and accurate weather briefings when it was possible to do so and highly pertinent to Zinn's route of flight.

Specifically, in undertaking to provide weather information, Pake only provided the weather directly in front of Zinn – at his twelve o'clock.  According to Order 7110.65P, the controller was required to indicate the weather directly to the west by stating, for example, that the weather ranged from eight or nine o'clock to twelve o'clock.  With  knowledge that Zinn was flying IFR in a small plane with limited weather capability, this controller failed to provide sufficient accurate weather information to allow Zinn to make informed decisions when requesting deviations.  The weather was severe enough that the controller knew or should have known that he needed to issue complete weather information, as required by the Air Traffic Control Manual.

_____

[10]     For instance, Zinn claims, without merit, that the first breach of the controllers' duty to Zinn occurred when the South Arrival Controller, Brian Rivers, cleared him for IFR and did not give any weather information or did not indicate that the IFR clearance would intersect hazardous weather.  Even if Zinn is right that Rivers would have known that Zinn would need adequate weather information in order to decide whether a particular deviation was prudent, the controller's duty to issue an IFR clearance did not require a complete weather briefing for the entire route of IFR flight under Order 7110.65P.  And moreover the information that Rivers could have provided would only have duplicated SIGMET3E that Zinn knew or should have known about.

Having failed to receive complete and accurate information about severe weather to his west, Zinn then elected to deviate 300 degrees west based solely on his own visual observations, directly into the path of the most hazardous weather.  Though one can speculate that Zinn would have trusted his own ability to see around that weather, it is reasonably probable that Zinn would have found an accurate weather briefing from Pake to be pertinent and material in his decision how to deviate around that weather.

In *Gill,* for instance, the court found that the controller should have provided additional and localized weather information as the pilot approached an area of bad weather.  To this end, the court stated: "even assuming that the pilot did receive the information, the possession of it would not excuse a subsequent breach of duty by the Waco controller possessed of greater experience, superior observation facilities, and localized information, as the pilot approached closer to the area of possible bad weather and requested localized and more current information." 429 F.2d at 1077.

Likewise, Zinn, after electing to turn northwest, asked if his heading looked clear and was not given any new weather information by Pake about the weather that was now before him.  This too was a clear breach of duty since a reasonable controller under these circumstances would have provided readily available information of severe weather in the exact area where a pilot requests to be deviated, particularly when the controller should have been aware of Zinn's limited access to weather information.

Further support for this conclusion can be found in *Ingham,* where the court found a breach of duty where a controller failed to provide weather information that would have impacted the crew's decision of whether to attempt a maneuver. 373 F.2d

at 235.   Like the controller in *Ingham,* who failed to provide accurate weather information reporting a decrease in visibility from one mile to three-quarters of a mile, so too did the controller in Zinn fail to provide accurate information identifying areas of high precipitation in the o'clock format required by the Air Traffic Controller's Manual.   *See also Abrisch,* 359 F. Supp. 2d at 1229 (the court found a breach of duty where a controller failed to provide a pilot with accurate and current weather information necessary to safely maneuver the plane); *Worthington,* 21 F.3d at 406 (finding that a controller breached his duty of reasonable care when he deprived a pilot of accurate and timely information about weather conditions).

The FAA has suggested that air traffic controllers do not argue with pilots when they request deviations or certain clearances.   That is not necessarily true.   Controllers regularly deny deviations or requests for clearances based on traffic separation or military protected zones, which we know to be the case just based on the communications that took place in this same area on October 19, 2005.   Indeed, one of the FAA's own witnesses, controller David Miller, testified credibly that he tries to grant a pilot's request for deviations based on what the pilot can see, but he must consider other factors as well which may counsel against approving a deviation. [D.E. 104 at 215].

But even if generally true, this does not negate the controllers' responsibility to provide accurate and pertinent information to the pilot so that he may make an informed decision.   As Mr. Miller credibly explained, controllers have a duty to provide pilots with the pertinent weather and advise them of what the controller can observe

from the information available to him.  That is indeed a joint responsibility that controllers exercising reasonable care assume. [D.E. 104 at 232].

In *Gill,* the defendant argued that FAA operators have no authority to require or duty to persuade a pilot to land.  Rejecting this argument, the court held: "Whether the controller can require the pilot to land is tangential, if relevant at all, to the government's duty to furnish accurately weather information in its possession once it has undertaken to supply such information." 429 F.2d at 1077.

When Pake undertook to provide weather information, his failure to exercise due care was a breach.  And knowing that an IFR pilot would rely on this information, he failed to either safely direct the pilot around the weather or provide enough information to allow the pilot to request deviations that would get him to safety.  The controller did not warn Zinn that he was flying into hazardous weather; instead the controller approved the pilot's request to fly closer to severe weather.

Compounding that breach of the duty of care, he then failed to provide any navigational assistance when the pilot requested.  By that point, safety demanded that a controller in the exercise of reasonable care provide more specific and swift assistance to an aircraft in imminent threat.  Even if no duty was breached by voluntarily suggesting a heading, when requested the controller, as he was trained and should have realized, did have the means to provide an alternative heading to assist the IFR pilot out of a hazardous area.[11]

---

[11]      Apart from the applicable regulations and procedures that support this point, the FAA's own controllers (possibly other than Pake) provided testimony that corroborates the Court's conclusions.  Controller David Miller credibly explained how he has been trained and how he handles similar situations:

These failures constituted a breach of the controller's duties of care, as required by FAA Order 7110.65P and relevant caselaw. *See, e.g., Daley,* 792 F.2d at 1085.

The FAA points us to cases like *Hensley v. United States,* 729 F. Supp. 716 (S.D. Fla. 1989) and *Barbosa v. United States,* 811 F.2d 1444 (11th Cir. 1987), as support for its contention that the controller's duty was not breached here. But *Hensley* is distinguishable because there was no indication in that case of unusual or remarkable weather conditions in the area of the accident. Here, the facts in the record clearly show otherwise. Additionally, as Zinn in this case was flying IFR in a small plane with limited weather equipment, the controller was indeed in a position to know that Zinn was in danger. That also distinguishes this case from *Barbosa* where the pilot was flying under a VFR flight plan and the controllers were not in a position to provide weather information because the circumstances required the suppression of weather information in order to vector IFR aircraft. Here, Zinn was flying under IFR conditions

---

Q.   Well, let me be more specific. Is it a common experience for you to have an aircraft, a general aviation aircraft, a GA, go into extreme weather? Is that something that happens?

A.   No.

Q.   You've never had that happen --

A.   No.

Q.   -- in your experience, have you?

A.   No.

Q.   And whatever -- how you do your job, somehow, you've always done your job in a way that prevented that from occurring, correct?

A.   Right. I mean, normally if I'm talking to a GA, a small, we'll say, a Cessna, I give him the weather area ahead. And he says, can you give me a vector to get around it. Then I will turn him -- and it's, again, the pilot asks me, they tell me, we don't have equipment on board or we're in IMC conditions, I can't see it, can you give us a vector to get around what you see. And then that's when I will turn the aircraft from what I see to get around it. And that's -- it's worked for me for 20 years.

[D.E. 106 at 34].

and it is clear from the record that relevant precipitation and intensity information was available to the controllers at the time of the accident.

With respect to the FAA's contention that Pake's primary duty was traffic separation at the particular time that Zinn claims further weather advisories were due, the record belies that argument. As the Court's Findings explain, Pake had provided a weather briefing. He timely did so at the initiation of contact with Zinn. That weather briefing was only partly complete, but at least the most pertinent given Zinn's route of flight. But when, only seconds later, Zinn requested a deviation that made Zinn's 10 o'clock position highly pertinent, Pake did not correct the deficient weather briefing. He thus left Zinn with incorrect information, and the communication transcript does not evidence any material distractions that precluded his ability to do so. Indeed, Pake testified with respect to this point and never claimed that he did not have time to provide a clarification for any reason.

Hence, when one undertakes a duty one must exercise reasonable care in doing so. Pake clearly had the time, and took the time, to give a weather briefing. Having done so, Pake reasonably should have also made an immediate correction or clarification to alert the pilot of what he could observe based on the information available to him. No such clarification was provided.

Finally, we note here that we cannot act like Monday morning quarterbacks who have the benefit of time and hindsight. A controller must make difficult on-the-spot judgments. The Court has fully taken that into account and recognizes why air traffic controllers have such a difficult and vital role to play. But the essence of tort law requires that the Court, as trier of fact, consider the facts from the perspective of a

reasonable controller in Pake's position. After evaluating the testimony of the credible experts who testified on both sides of this question, the FAA controllers themselves, and the applicable regulations, we must find that the controller, in good faith, neglected to perform all his duties on this particular occasion, which contributed to a tragic accident. We also recognize that this controller – like countless others – likely does his job perfectly well 99% of the time. Unfortunately, judgments made on October 19, 2005 did not live up to that lofty, but necessary, standard.

Therefore, the greater weight of the evidence supports the conclusion that the FAA's controller Pake breached his duty of care owed to Zinn before the fatal crash.

### 3. *Causation*

We turn then to the most perplexing aspect of the case with regard to the FAA's negligence – the question of causation. To establish proximate cause in Florida, the court must find both a cause in fact (that the injury would not have occurred "but for" the negligent act) and that the injury was a reasonably foreseeable result of the act. *See Clay Electric,* 876 So. 2d at 1185; *Stevens,* 994 So. 2d at 1066; *see, e.g., Abrisch,* 359 F. Supp. 2d at 1230 (an act of negligence proximately causes an injury if "it can reasonably be said that, except for the negligence, the loss, injury or damage would not have occurred."); *Dep't of Children and Family Servs. v. Amora,* 944 So. 2d 431, 435-36 (Fla. 4th DCA 2006) (there should be "such a natural, direct, and continuous sequence between the negligent act and the injury that it can be said that but for the act the injury would not have occurred.").

To find that the plaintiff's injury was a foreseeable result of the defendant's negligent act, the Court must determine if the act "directly and in natural and continuous sequence produces, or contributes substantially to producing such damage . . . ." *Abrisch,* 359 F. Supp. 2d at 1229-30.  The test for foreseeability turns on "whether the harm that occurred was within the scope of the danger attributable to the defendant's negligent conduct." *Worthington,* 21 F.3d at 405.

There is little doubt that, absent intervening circumstances, the breach of the final controller's duties of care would constitute a "but for" cause of Zinn's crash.  But for the failure to issue complete, adequate, and timely weather information and allowing without warning Zinn into the edge of a convective cell, Zinn could have diverted or maneuvered the plane differently to prevent the fatal crash.  *See, e.g., Ingham,* 373 F.2d at 236 (disagreeing with the government's contention that any breach was not the proximate cause of the accident, "if the crew had been notified of the changing weather conditions, the pilot might have decided to divert to Philadelphia rather than to attempt and ILS landing at Idlewild.  Moreover . . . they might have maneuvered the plane differently . . ."); *Himmler,* 474 F.2d at 941 ("From a proximate cause standpoint . . . the court permitted a lack of knowledge on the pilot's part to equal a different decision in the handling of the airplane, even though there was, of course, no way of determining that the knowledge would actually have made a difference in the pilot's handling."); *Black v. United States,* 441 F.2d 741, 744 (5th Cir. 1971) ("When the negligence of the defendant greatly multiplies the chances of harm to the plaintiff, and is of a character naturally leading to its occurrence, the mere possibility that it might

have happened without the negligence is not sufficient to break the chain of cause and effect between the negligence and the injury.").[12]

The problematic issue is whether Zinn's death was not directly and in a continuous sequence caused by the controller's negligent failure to provide adequate weather information, warnings, or vectoring services to avoid the weather.  Specifically, the FAA argues that the chain of causation ends with Zinn's own negligence in piloting his aircraft into a known area of convective activity.  And, apart from that, the fact that Zinn was ultimately able to recover control of his aircraft for a short period prior to the crash, when he was able to maneuver the aircraft after emerging from the storm clouds, shows that the crash did not naturally and sequentially result from any controller negligence.

Under Florida law a separate action is an intervening cause so as to cut off a defendant's liability only when it is "completely independent of, and not in any way set in motion by, the tortfeasor's negligence."  *Lindsey v. Bell South Telecomm., Inc.,* 943

---

[12]    Again, this conclusion is in contrast with the alleged negligence of the controllers who worked Zinn's aircraft before Pake.  Even assuming that improper or incomplete weather briefings were provided by those controllers, the Court has found that they were not a cause in fact or proximate cause of Zinn's loss because Zinn clearly possessed the same information and chose to act on his own assessments of the risks involved.   *See, e.g., Black,* 441 F.2d at 745 ("ATC's failure to warn a pilot of the presence of a storm in his path cannot be regarded as a continuing proximate cause after the pilot himself discovered its presence, appreciated the danger, and decided to fly ahead into it."); *Bauer v. United States,* 289 F. Supp. 2d 944, 950 (N.D. Ill. 2002) (when a pilot knows or should know what weather he will encounter in flight, nothing the weather briefer does or fails to do can be the proximate cause of a later crash), *aff'd sub nom., Spurgin-Dienst v. United States,* 359 F.3d 451 (7th Cir. 2004); *Jackson v. United States,* 983 F. Supp. 273, 280-84 (D. Mass. 1997) (under West Virginia's comparative negligence rule, the negligence of the controller in failing to pass on the PIREPs was not a proximate cause of the accident because the pilot knew of the icing conditions), *aff'd,* 156 F.3d 230 (1st Cir. 1998).

So. 2d 963, 965 (Fla. 4th DCA 2006). If the intervening act is foreseeable, the original negligent actor may still be liable. *Goldberg v. Florida Power & Light Co.,* 899 So. 2d 1105, 1116 (Fla. 2005). The dispositive test is "whether the harm that occurred was within the scope of danger attributable to the defendant's negligent conduct." *Id.* "[H]arm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *McCain,* 593 So. 2d at 503.

As the Court's Findings and the discussion that follows in section II.B shows, Zinn's own negligence was a primary cause of the loss of his aircraft. The Court's Findings and Conclusions in this regard reveal that Zinn's negligence had already set in motion the chain of events that led to the crash. In short, Zinn (1) failed to maintain proper certification for IFR operations by missing a compliance check due on June 30, 2005; (2) failed to acknowledge pertinent SIGMETs in deciding to disregard the preferential departure route out of Boca Raton, which would have taken him west of the area covered by the convective SIGMETs; (3) failed to comply with FAA Advisory Circular and Airman's Information Manual (AIM) recommendations of avoiding thunderstorms by at least 20 miles when he flew into an area covered by SIGMET 3E and SIGMET 5E; (4) failed to consider the weather information that his own stormscope was more likely than not providing him; and (5) when he finally found himself near or inside a convective cell, he negligently piloted his aircraft through the storm by reducing power.

Consequently, if anything, it was Zinn's negligence that "set in motion" the FAA's controller's negligent omissions in the pertinent weather briefings provided to Zinn. But the question remains whether Zinn's negligence is simply comparative in nature, in which case the amount of damages is reduced accordingly. Or, did Zinn's negligence operate as an intervening and superseding cause of the aircraft's loss, such that the controller's negligence was no longer causally related to the loss?

After thoroughly considering the record evidence presented, we find that as a factual matter, and applying principles of Florida law, Zinn's negligence was not an intervening or superseding event to cut off all liability against the FAA. Instead, Zinn's negligence musts be considered in terms of comparative negligence as a joint torfeasor who contributed to the loss. The FAA's negligence remains a cause in fact and proximate cause of the loss.

In aircraft cases, courts have found that an airplane crash can be legally caused by more than one proximate cause, and "the mere fact that the plaintiffs were unable to show which of two projected causes was the actual cause of the crash did not mean that they had failed in their burden of proof." *Springer,* 641 F. Supp. at 938; *see, e.g., Worthington,* 21 F.3d at 405-06 ("[I]f an intervening cause is foreseeable, the original negligent actor may still be held liable."; to relieve a negligent actor of liability, the intervening action must be either bizarre or unforeseeable in order to interrupt the causal chain); *Tinkler v. United States,* 982 F.2d 1456, 1461 (10th Cir. 1992) ("[I]f the first actor was negligent and the second actor's further negligent conduct was foreseen or reasonably should have been foreseen, the first actor is not relieved of liability.");

*Ingham,* 373 F.2d at 237 (where the FAA's negligent act sets in motion an entire chain of events, and where the government's negligence remains ever-present throughout the chain of events, a plane crash constitutes a foreseeable link in the original chain of causation, and a pilot's actions do not break the causal chain).

That is consistent with Florida law.  "An actor's negligence may be a legal cause of damage even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time as the negligence and if the negligence contributes substantially to producing such damage." *Abrisch,* 359 F. Supp. 2d at 1230 (citation omitted).

Here, the controller's negligence operated in combination with Zinn's failure to avoid the approaching convective activity altogether.  Indeed, the very reason why the FAA has undertaken the duty to provide weather assistance to pilots is the threat that weather, and thunderstorm activity in particular, presents to the flying public.  It is, therefore, quite foreseeable for FAA controllers to control aircraft that may be negligently approximating dangerous weather on their intended routes of flight.  The pilots' negligence in failing to heed the FAA's own warnings about staying clear of severe weather is thus entirely foreseeable to the FAA as its controllers see that all the time.  As controller David Miller explained, it is not uncommon for pilots to try and "skud run" and maneuver around areas of bad weather.

Accordingly, though the FAA's negligence did not set in motion the chain of events that led to Zinn's death, its negligence acted in concert with Zinn's own negligence.  Zinn's pre-existing negligence was indeed foreseeable; thus the other

negligent actor – the FAA controller – may still be liable because the harm was within the scope of danger attributable to that negligent conduct. *Goldberg,* 899 So. 2d at 1116. *See also Webb,* 840 F. Supp. at 1521 (court found that a specialist's failure to warn the pilot of adverse weather was the proximate cause of the crash where, but for the failure, "the pilot would have been provided additional warning of the seriousness of the conditions into which he was taking himself . . . and the accident may have been avoided."); *Daley,* 729 F.2d at 1086-87 (court found that a controller's failure to do more to assist a pilot by providing the pilot with a warning that the plane was in the immediate vicinity of danger constituted a proximate cause of the crash).

The Court's conclusions would be different if we could find that Zinn's own negligence amounted to unexpected *gross* negligence that would indeed break the chain of causation. *See Worthington,* 21 F.3d at 405-06 (to relieve a negligent actor of liability, the intervening action must be either bizarre or unforeseeable in order to interrupt the causal chain). In *Tinkler,* for instance, despite finding that the FAA specialist negligently failed to provide the pilot with accurate and necessary pre-flight weather information two hours before a crash, the court found that the pilot's subsequent failure to obtain weather from another source and his negligent piloting of his aircraft at an altitude of 500 feet for a period of ten minutes broke the causal chain. 982 F.2d at 1470. But unlike the pilot in *Tinkler,* whose actions were deemed to constitute gross negligence, Zinn did not commit any acts of gross negligence that would interrupt the

causal chain from the controller's failure to provide in-flight weather information less than five minutes before the plane crashed.[13]

Similarly, we cannot say with reasonable probability that, had the corrected weather briefing been provided to him, Zinn would definitely have continued toward a 300 degree deviation.  Though it is by no means impossible, we find that it is likely that Zinn would have taken this material information into consideration in reassessing his deviation.  *See, e.g., Himmler,* 474 F. Supp. at 922-23 (court found that the controller's negligent failure to provide "the information necessary and essential to the informed decision to be made by the pilot in command," proximately caused the pilot's resulting damage).

As a result, we can distinguish this case from others like *In re Air Crash at Dallas/Fort Worth Airport,* where the issue was whether a Delta flight crew or the government air traffic controllers were to blame for the airplane's fatal entry into a convective cell just before landing.  *In re Air Crash at Dallas/Forth Worth Airport,* 919

---

[13]    The same can be said with respect to the FAA's reliance on *Black v. United States,* 441 F.2d at 741.  There the court found that the negligent failure of the controller to provide a pilot who requested the altimeter setting for an airport with the relevant SIGMET information was superseded by the pilot's negligent failure to heed the warning of the presence of the storm after observing it for himself.  *Id.* at 745.  But in *Black* the pilot displayed gross negligence by departing under VFR without filing a flight plan and without obtaining a pre-flight weather briefing.  Zinn, on the other hand, did not act so grossly negligent by departing IFR after properly filing a flight plan and, more likely than not, obtaining a weather briefing.  Also, in *Black,* the pilot communicated with controllers only once during his flight and never indicated an emergency situation, while Zinn frequently communicated with controllers who had knowledge of Zinn's imminent threat.  Thus, Zinn's negligence was not of such a gross and unforeseeable character as to supersede the controller's failure to provide complete and accurate weather information.

F.2d 1079, 1084 (5th Cir. 1991).  There the Fifth Circuit affirmed the district court's factual finding that, although the air traffic controllers had been negligent in failing to relay information of a thunderstorm at the airport, any failure of the air traffic controllers to warn a pilot of the presence of a storm in his path could not be regarded as a continuing proximate cause after the pilot himself discovered its presence, appreciated the danger, and decided to fly ahead into it.  *Id.* at 1085 (citing *Black,* 441 F.2d at 745).  The court considered the failure of the governmental employees to pass on weather information to have been inconsequential to the fate of Flight 191 in that there was no evidence that the crew would have acted differently with this confirmation of information already known.  *Id.*  After all, the only way to have acted differently was to immediately abort the landing approach and go around.  That did not happen and the pilot decided to attempt the landing.

Here, on the other hand, we cannot make the factual finding that the court in *In re Air Crash at Dallas / Forth Worth Airport* made.  We have evidence in this record that supports the Court's finding that indeed the pilot would have had time and means to reconsider his deviation.  Indeed, Zinn was aware of the convective activity in the area but his purpose in deviating was to *avoid* the center of any convective activity, rather than to confront it.  When presented with a complete and accurate briefing from Pake, prudent piloting would have likely caused him to reevaluate his deviation.  That is why the negligent briefing is all the more tragic.  Perhaps, an accurate briefing could have helped Zinn safe himself.

Moreover, we can definitively make this finding precisely because Zinn, upon entering the leading edge of this cell, asked the controller to help him get out of it when he was in "bad shape." That itself proves that Zinn had no intention of being in the center of a convective cell. His request for assistance plainly evidences his understanding that he was in imminent peril and was trying to get out of it. That provides us with no basis to find Zinn grossly negligent. Again, the controller did not timely provide him with that assistance that the controller was duty bound to provide.

The final question on the causation issue is whether Zinn was ultimately able to survive and recover from the effects of the convective activity and resume the ability to fly the aircraft. The FAA contends that witness testimony at the scene reveals that he was indeed able to do so, thus the final crash was not the product of a direct and continuous series of events that flowed from the controller's negligence. He crashed, instead, based upon his inability to maneuver his aircraft and properly locate a safe place to land. In other words, he lost control for reasons *other than* the thunderstorm he had encountered.

The problem with this theory is that there is very little compelling record evidence to support it. Instead, it is more likely than not that the aircraft suffered some type of structural or engine damage as a result of flying into the severe weather and was uncontrollable upon descending. Even if the aircraft was maneuverable at this point, the pilot's actions would not constitute an intervening cause because they were not completely independent of the controller's negligence. Witnesses near the site of the crash reported hearing "sputtering" sounds from the aircraft prior to its crash. Others

reported seeing the pilot try to control the aircraft but he then banked hard left and into a nose down position.  This all evidences that the pilot himself may have become reoriented but that he was unable to regain physical control of the aircraft.

We know that from the credible expert testimony presented at trial from both sides that flying through severe weather can cause a host of problems for an airplane like Zinn's.  More likely than not, the severe wind shear, turbulence and loss of altitude it encountered affected some aspect of the structural integrity of the aircraft or possibly even the in-line engines' ability to maintain synchronized control.  Given that the aircraft was largely destroyed by the crash and fire that resulted, no expert was able to say with certainty what particular damage caused Zinn to lose control.  Nor could do they say definitively that Zinn was not physically incapacitated in some way.  Based on the evidence that was presented, however, we can only find that it is more likely than not that Zinn's inability to control the aircraft after he emerged from below the clouds was causally related to the effects of the severe convective cell he passed through.

Therefore, as the controller's negligence was both a cause in fact and proximate cause of the accident, in conjunction with Zinn's own negligence, the FAA's negligence materially contributed to and helped cause Zinn's death.  Before addressing the determination of the amount of compensatory damages attributable to this negligence, we must next address in more detail the extent of Zinn's own negligence in this case.

**B.**   _Zinn's Negligence_

### 1.  Duty

Federal Aviation Regulations ("FARs") governing the conduct of pilots are published in Title 14 of the Code of Federal Regulations.  FARs are the "rules of the road" for pilots and have the force and effect of law.  _See In re N-500L Cases,_ 691 F.2d 15, 28 (1st Cir. 1982); _United States v. Schultetus,_ 277 F.2d 322, 327 (5th Cir. 1960).  FARs are evidence of what a reasonable pilot would have done under the circumstances.  _See Campbell v. Keystone Aerial Surveys, Inc.,_ 138 F.3d 996, 1003 (5th Cir. 1998).

The FARs provide that the pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft. 14 C.F.R. § 91.3(a).  The pilot in command, before beginning a flight, shall become familiar with all available information concerning that flight.  14 C.F.R. § 91.103.  That includes the obligation to become knowledgeable of the applicable portions of the AIM.  _In re N-500L Cases,_ 691 F.2d at 28; _Mallen v. United States,_ 506 F. Supp. 728, 735 (N.D. Ga. 1979), _aff'd,_ 632 F.2d 891 (5th Cir. 1980).

The AIM also constitutes evidence of the standard of care for pilots.  _See Barbosa,_ 811 F.2d at 1446-47; _In re Aircrash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,_ 635 F.2d 67, 75-76 (2d Cir. 1980); _Muncie Aviation Corp. v. Party Doll Fleet, Inc.,_ 519 F.2d 1178 (5th Cir. 1975).  Pilots must also be familiar with the applicable portions of Advisory Circulars.  _See_ 14 C.F.R. § 61.105(a), (b)(3).

It is undisputed that the FARs provide that the pilot in command is directly responsible for, and is the final authority as to, the operation of his aircraft. 14 C.F.R.

§ 91.3(a). "Rule one (of the FARs) makes it clear that the pilot in command, like the ship captain, has the ultimate responsibility for the safety of his plane and his passengers and must comply with the extensive body of regulations published by the FAA." *Srock v. United States,* 462 F. Supp. 2d 812, 825 (E.D. Mich. 2006); *see also Black,* 441 F.2d at 744.

The pilot's ultimate command of his aircraft is not subordinate to air traffic control. *In re Aircrash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,* 635 F.2d at 74. Though the responsibilities of pilots and controllers are concurrent in many respects, "the pilot's knowledge of his own, his crew's, and his aircraft's capabilities and limitations, is of preeminent importance in this cooperative situation. None of these matters can be known by ATC." *In re Aircrash Disaster at Boston, Mass., July 31, 1973,* 412 F. Supp. 959, 989 (D. Mass. 1976), *aff'd sub nom., Delta Air Lines, Inc. v. United States,* 561 F.2d 381 (1st Cir. 1977). In other words, "air traffic controllers are not to 'get into the cockpit and fly the plane for the pilot.'" *Id.* at 981.

Specifically, pilots are charged with knowledge of the hazards of weather. Before obtaining a private pilot certificate, pilots are trained to recognize critical weather situations from the ground and in flight, and how to procure and use aeronautical weather reports and forecasts. 14 C.F.R. § 61.105(a), (b)(6). As part of their pre-flight duties, pilots must obtain all available information concerning the flight, including weather reports, weather forecasts and Notices to Airmen (NOTAMs). *Black,* 441 F.2d at 744. Pilots also have a specific obligation to apprise themselves fully of prevailing

and expected weather conditions along the route of flight. *See, e.g., In re Air Crash at Dallas/Fort Worth Airport,* 720 F. Supp. at 1280.

Prior to takeoff, the pilot has the sole responsibility to determine whether it is safe or unsafe to undertake the proposed flight. *Jackson,* 983 F. Supp. at 282. As to whether or not to proceed with a flight, the ultimate decision is the pilot's, since the crew knows the condition of the aircraft, its capabilities and must deal with the unusual and unexpected during flight. *Airplanes of Boca, Inc. v. United States,* 254 F. Supp. 2d 1304, 1313 (S.D. Fla. 2003), *aff'd,* 112 Fed. Appx. 4 (11th Cir. June 17, 2004). A pilot is charged with that knowledge which, in the exercise of due care, he or she should have known. *Black,* 441 F.2d at 743-44.

Pilots also have a continuing duty to be aware of dangers which they can perceive with their own eyes, ears and instruments. *In re Aircrash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,* 635 F.2d at 74; *In re Air Crash at Dallas/Fort Worth Airport,* 720 F. Supp. at 1280. Pilots have a continuing duty to be aware of danger when they can gather adequate information with their own eyes. *Srock,* 462 F. Supp. 2d at 826. Pilots must especially keep a lookout for adverse weather. *In re Aircrash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,* 635 F.2d at 74. This includes a duty to interpret and evaluate conditions encountered en route. *Jackson v. United States,* 156 F.3d 230, 235 (1st Cir. 1998); *Hensley,* 728 F. Supp. at 722.

## 2. *Breach of Zinn's Duties*

One of the reasons that pilots are duty bound to properly monitor weather conditions is to avoid thunderstorms and convective activity of the type that Zinn

encountered.  Pilots are trained and warned in various forms, including FAA pilot advisories and aircraft manuals that Zinn had available to him, to avoid thunderstorm activity by 20 nautical miles.  As this case proves, one need not be in the center of convective activity for the appreciable dangerous effects of thunderstorms to damage an aircraft in flight.  The turbulence and wind shear that accompany serious convective activity can extend far beyond the center of a particular cell.  Consequently, a pilot has a duty to monitor weather to avoid encountering those effects.

Pilots do not always abide by those duties.  As the record shows, pilots often will try and skirt around thunderstorm activity to avoid having to alter a route of flight, especially in areas prone to thunderstorm activity like South Florida.  When one does so, a pilot assumes a serious risk of error and danger by not planning a route that avoids that weather altogether.  And in those circumstances, the FAA cannot be deemed to be a guarantor of good weather nor an insurer against a pilot's mis-judgments.

In this case, Zinn had not piloted his aircraft for some time.  He was, however, a very experienced pilot and clearly familiar with the type of convective weather that South Florida regularly presents.  He was, more likely than not, apprised prior to his flight as to the threat that a trough of weather across Florida could have presented.  He was informed of the presence and development of convective activity in his path, as SIGMET 3E warned.  Upon takeoff, we know he was aware of that weather based upon his communications with controllers that evidenced he could see weather ahead of him and his multiple requests for deviations.

Notwithstanding this knowledge, Zinn also appears to have been pressed for time.  He was planning a trip to play golf in Myrtle Beach, South Carolina.  Upon

takeoff in the early afternoon, he intended initially to maintain VFR conditions and fly a direct route.  Though he had filed an IFR flight plan, his first request to air traffic control was to maintain VFR and fly direct to Ormond Beach.  When asked if he wanted to accept IFR clearance, he agreed but only if he could "go straight to Ormond Beach. . . ."  His IFR flight plan, however, called for a preferential departure through the Lamore departure route that would have routed him west before turning to north.  Zinn clearly did not want to maintain that departure route.  He insisted on a straight north route, which controllers approved, and then he would "see what happens when I get north."

In hindsight, Zinn should have proceeded with a Lamore departure given the weather developing between Lake Okeechobee and Stuart.  Zinn's decisionmaking in this regard is not necessarily unusual.  And as the FAA's expert conceded, it was not negligent per se to try and depart on a more straight northerly path and avoid the Lamore departure route.  But immediately upon takeoff when he was able to see ahead of him weather buildups consistent with SIGMET 3E, a reasonable pilot would have sought a more westerly route in order to comply with the duty to avoid thunderstorm activity by at least 20 nautical miles.  After all, as his own expert conceded, had he seen SIGMET 3E and reviewed radar charts that indicated a line of thunderstorms across his route of flight, "he would hold off on the flight or plan a route to do whatever was necessary to go around the line of storm."  Prior to takeoff, Zinn had available to him this same type of information but decided to seek a direct north route that would likely intercept this same line of thunderstorms.

Moreover, Zinn should have remained VFR on this flight because his IFR certification was no longer current. He may or may not have realized it at the time, but he had missed a compliance check that was due in June 2005, which meant that he was no longer IFR capable. Had he maintained VFR conditions on that day, it is more likely than not that he would have had to stay further clear of the convective activity he tried to fly around.

But beyond that certification issue, once he took off and confirmed that the type of convective activity that SIGMET 3E was warning pilots about on that afternoon was directly in his route of flight, Zinn had time to decide to avoid all that weather and stay clear of it by 20 nautical miles. He had been advised by the controller who initially cleared him that a route to Vero Beach may have kept him out of weather west of Stuart. That may have been true at the time, but weather is not stagnant. As SIGMET 3E warned, the weather around Stuart was developing. The weather "west of Stuart" was joining with weather activity over the Atlantic and become one heavy squall line. Zinn could have also seen that development on his stormscope.

After requesting a deviation east of his route to avoid a "buildup" Zinn was presented with a weather advisory warning of heavy precipitation at his 12 o'clock position. At that point, even if we give him the benefit of the doubt that he (like the initial controller) believed shortly after takeoff that he could avoid that weather west of Stuart on a direct route to Vero, he still had time to make a decision to alter his route and avoid the thunderstorm activity altogether. An immediate 270 degree turn to join the westerly Lamore departure route was still possible at this point and would have helped him stay clear of the line of thunder cell activity that he was encountering.

Such a marked deviation from his route of flight would have delayed his ultimate arrival. It would, however, have likely saved him and his aircraft from the effects of the convective activity he was about to encounter.

So, even if it was not negligent to try to initiate a direct route over Southeast Florida after takeoff, his decision to maintain his route of flight even at this point in time clearly breached his duty of care. The reason why is that an objectively reasonable pilot on this type of aircraft (when presented with SIGMET 3E, the weather briefing that was provided by the controller, his stormscope gauge that more likely than not showed heavy electrical activity north, northwest, and also probably northeast of his aircraft) would have altered course to comply with the duty to avoid altogether thunderstorm activity by 20 nautical miles, in compliance with 14 C.F.R. § 61.105(a), (b)(6).

By this point Zinn had discovered the presence of an imminent threat, appreciated the danger, but decided to skirt around the center of the convective activity. *See Black,* 441 F.2d at 745 ("any contributing effect of the operator's negligent failure was replaced by the negligent action of the pilot when he saw but did not heed the warning off the actual presence of the storm itself."); *Spurgin-Dienst v. United States,* 359 F.3d 451, 455-56 (7th Cir. 2004) (pilot negligently decided to depart despite known dangerous ice conditions that would be present throughout route of flight); *Jackson,* 983 F. Supp. at 280-84 (pilot negligently flew into known dangerous ice conditions that was cause of aircraft's loss despite controller's failure to disseminate PIREP information); *Bierberle v. United States,* 255 F. Supp. 2d 1190, 1203-04 (D. Kan. 2003) (pilot

negligently decided to depart despite known dangerous thunderstorm and fog conditions along route of flight).

Undoubtedly, Zinn had successfully taken the same approach to other thunderstorms he encountered in his many years of experience, just as many other pilots regularly do as well. In doing this, however, there is always a risk that a pilot will encounter a particularly severe cell that will overwhelm the pilot's and aircraft's capabilities. The pilot in command bears the primary responsibility when that risk materializes.

Finally, the Court has found that Zinn also mishandled his aircraft upon entering the leading edge of a convective cell when he clearly reduced power based upon the landing gear alarm that can be heard on the ATC transmission. As the experts credibly explained at trial, a prudent pilot under the circumstances would not reduce power to idle and try to transverse a thunderstorm at power. Pilots are trained to do so and are also advised to do so by FAA advisories and aircraft operation manuals. Zinn breached the duty of care by reducing his aircraft's power to idle when encountering the effects of the storm.

### 3.   Causation

To establish proximate cause in Florida, the court must find both a cause in fact (that the injury would not have occurred "but for" the negligent act) and that the injury was a reasonably foreseeable result of the act. *See Clay Electric,* 876 So. 2d at 1185; *Stevens,* 994 So. 2d at 1066; *Abrisch,* 359 F. Supp. 2d at 1230. To find that an injury was a foreseeable result of a party's negligent act, the Court must determine if the act

"directly and in natural and continuous sequence produces, or contributes substantially to producing such damage . . . ." *Abrisch,* 359 F. Supp. 2d at 1229-30.   The test for foreseeability turns on "whether the harm that occurred was within the scope of the danger attributable to the defendant's negligent conduct." *Worthington,* 21 F.3d at 405.

Zinn's own negligence in planning and executing his flight plan, in flying in IFR conditions when not certified to do so, and in handling his aircraft upon entering a convective cell, all helped cause in fact the loss of his aircraft.   Zinn's breach of his duties as pilot in command resulted in the very type of harm that can reasonably be expected from flying into known areas of convective weather.   The failure to heed the warnings of hazardous weather that were known or should have been known to him resulted in that injury to himself and his aircraft.

Therefore, the Court finds that Zinn's breach of his duties as pilot in command proximately resulted in the damages and injuries suffered in this case.   And that liability was not relieved or superseded by the FAA's negligence in failing to provide complete and accurate weather briefings during his route of flight or in failing to provide Zinn with the assistance he requested.   *See, e.g., Abrisch,* 359 F. Supp. 2d at 1230 ("An actor's negligence may be a legal cause of damage even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time as the negligence and if the negligence contributes substantially to producing such damage.") (citation omitted).

C.    ***Apportionment of Fault***

Under Florida's comparative fault doctrine, the finder of fact must apportion the respective fault of the negligent parties. *See Hoffman v. Jones,* 280 So. 2d 431, 438 (Fla. 1973). The Eleventh Circuit has specifically approved the use of comparative negligence principles in a Florida airplane crash case against the government under the FTCA. *See Worthington,* 21 F.3d at 407.

There is, of course, no magic formula by which a comparative fault assessment can be made.  The Court as trier of fact must make the best judgment considering all the evidence submitted in the record.  The basic question the Court posed is whether either party's negligence was materially greater than the other.  The most compelling evidence presented shows that the party who shoulders the greatest responsibility for this tragic accident is the pilot in command.  Zinn made the greatest number of decisions that proved to be negligent under the circumstances.  The Court has found, contrary to Zinn's claims, that the majority of the controllers who handled his aircraft did not breach their duties of care, or if they did those breaches did not proximately cause Zinn's damages.  Only one controller was found to have definitely breached his duties of care and, predominantly, based upon that controller's failure to provide a complete and accurate weather briefing when called to do so.

On the other hand, the controller's negligence played a material role in the loss of the pilot and his aircraft.  That negligence cannot be discounted to a nominal or minimal amount and must be found to have substantially contributed to the loss.

Therefore, the Court exercises its best judgment as trier of fact and concludes that Zinn is primarily responsible for the damages caused and is 60% responsible.  The FAA is responsible for 40% of the damages that resulted from its controller's breach of the duty of care.

**D.   _Damages_**

Because Mr. Zinn was survived by a lineal descendant, Randi Zinn, the Estate of Michael Zinn is entitled to recover wrongful death damages under Fla. Stat. § 768.21(6), which provides that the decedent's personal representative may recover the following for "loss of prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death, reduced to present money value" and "funeral expenses."

"Net accumulations" is defined under Fla. Stat § 768.18 as:

> The part of the decedent's expected net business or salary income, including pension benefits, that the decedent probably would have retained as savings and left as part of her or his estate if the decedent had lived her or his normal life expectancy.  "Net business or salary income" is the part of the decedent's probable gross income after taxes, excluding income from investments continuing beyond death, that remains after deducting the decedent's personal expenses and support of survivors, excluding contributions in kind.

As a result of this statutory language, net accumulations "are more than replacement salary." _Delta Airlines, Inc. v. Ageloff,_ 552 So. 2d 1089, 1092 (Fla. 1989). Net accumulations are thus "supposed to represent what the decedent's estate would have been worth at death." _Id._  The purpose of allowing a personal representative to recover net accumulations is "to preserve what has been lost by the decedent's untimely death." _Wilcox v. Leverock,_ 548 So. 2d 1116, 1118 (Fla. 1989).  The focus of a court's

inquiry should be on "monies which would have accumulated as a result of the skill or efforts of the decedent." *Id.*; *see also Smith v. Lassing,* 189 So. 2d 244 (Fla. 4th DCA 1966).

It is also clear that under Florida's statute investment income that would continue to accrue beyond a decedent's death and regardless of the decedent's efforts is considered passive income and not recoverable under the statute. *See Hiatt v. United States,* 910 F.2d 737, 745-46 (11th Cir. 1990).

An illustration of this analysis is found in *Smith v. Lassing*. In that case, the defendant was attempting to exclude money generated by the decedent from rentals and interest. 129 So. 2d at 245. The decedent, who was characterized as "an astute business woman, frugal, and modest" had rental properties "in an area of growth." *Id.* According to the court, the amount of investment income and the size and nature of her estate were all relevant and material because "they bear upon the decedent's habits of industry, means, business, earning skill, and her reasonable future expectancy. *Id.* at 247 ("Dealing with the question solely on the basis of admissibility of evidence it becomes apparent that there can be no separation of income into categories of "earned income" or "unearned income" or "investment income" . . . for the reason that more often than not any evidence of earnings is a combination of all. . . . The measurement of damages necessarily involves consideration of all of the facts which directly pertain to the decedents earnings in the past, her age, health, business capacity, education, habits, experience, energy, morals, social capability, skill and environment and her present and

future prospects of business success at the time of her death and her thrift and probable duration of her life.").

In addition, we must also take into account that, under Florida law, damages cannot be speculative and must be proved with reasonable certainty. *Nebula Glass Intern., Inc. v. Reichhold, Inc.,* 454 F.3d 1203, 1213 (11th Cir. 2006) (citing *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.,* 545 So. 2d 1348, 1350-51 (Fla. 1989); *Twyman v. Roell,* 123 Fla. 2, 166 So. 215, 218 (1936)).

Based on these principles, we assume that under Florida law we can determine that the estate has suffered damage from lost salary, lost investments and capital gains that would have accrued to the estate from Zinn's active participation during his lifetime.  But we must make that determination without unduly speculating and by rendering a fair judgment as trier of fact with reasonable certainty as to the fact and amount of damage.

As the Court's Findings make clear, we cannot make that determination quite as easily in this case, at least with respect to lost investments or capital gains.  Unlike a landlord, who owns a regularly-accruing interest in rent that can be measured with definite certainty, Zinn is a venture capitalist who engaged in complex energy-producing enterprises that were inherently risky and difficult to value.  Some of his investments were passive in nature, as Zinn and his expert readily concede.  Some of the product of his labor was undoubtedly active in nature, meaning that his active participation was essential to the end product.

But one difficulty lies in defining each form of investment in this case. This record does not lend itself to that determination with any reasonable certainty. And even if it did, the even greater problem lies in valuing what those active investments would have netted the estate had Zinn not been lost in October 2005. Under Florida law, we must have a reasonable yardstick by which to measure that damage to the estate. *See, e.g., Alphamed Pharms. Corp. v. Arriva Pharms. Inc.,* 432 F. Supp. 2d 1319, 1339 (S.D. Fla. 2006) (anticipated profits were "too speculative and dependent upon changing circumstances to warrant a judgment for their loss" absent sufficient evidence 'to determine damages for lost profits with a reasonable degree of certainty, rather than by means of speculation and conjecture.'") (citation omitted).

Zinn's proposed yardstick – an average of all past capital gains multiplied on an annual basis without adequately discounting for inherent risk – is not credible or persuasive to us as a trier of fact without material modifications. Even assuming that Florida law allowed us to award lost capital gains in this manner, which we doubt, we find as a factual matter that we do not consider such a yardstick to be reasonable under the circumstances in the manner in which the estate's expert proposes.

Moreover, even if we applied a lost capital gains analysis here, Zinn's calculations would have to be revised to account for the great risk involved in these ventures, and reduced by the usual net accumulations that the estate obtained from Zinn while he was alive.

Alternatively, we can make a reasonable inference of imputed salary over the course of his working life, that includes allocations that assume greater income from

active investments Zinn made as head of a venture capital firm.  That analysis, which is more certain, less speculative, and more reasonable produces, remarkably, about the same amount to the estate as the modified capital gains analysis.  That fact further supports the Court's ultimate damage award in this case.

Accordingly, the Court has found that the net accumulations to this estate are as set forth above.  The Court rejected the calculation proffered by Zinn's damages expert in the process, and adopted with substantial modification the methodology proposed by the FAA's expert.  The Court's final net accumulation calculation is fully compensable under Florida's wrongful death statute, Fla. Stat. § 768.18, and best reflects a credible and reliable damage assessment that gives the estate the benefit of unrealized salary income and capital gains that were lost at Zinn's death.

Moreover, pursuant to Fla. Stat. § 768.21(3), Randi Zinn may recover for lost parental companionship, instruction, and guidance.  The Court has awarded her a just and reasonable sum to help compensate for the loss of her father in October 2005.

The Court's ultimate factual findings must then be apportioned pursuant to the Court's finding of comparative negligence in this case against Zinn himself.  Accordingly, the total award for economic or non-economic damages  must be adjusted accordingly by the percentage of negligence attributable to the FAA .

* * *

### III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** and **ADJUDGED** that judgment shall be entered by separate Order in favor of the Estate of Michael Zinn as to Count I of the complaint, which judgment shall award the Estate as compensatory damages, apportioned for comparative negligence, a total of $4,370,331.66.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 30th day of November, 2011.

EDWIN G. TORRES
United States Magistrate Judge